# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 09-0824

BRADLEY GRIFFITH

VERSUS

RESA LATIOLAIS

\*\*\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-20055193
HONORABLE DAVID BLANCHET, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

## JIMMIE C. PETERS
## JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Jimmie C. Peters, Marc T. Amy, Billy H. Ezell, and David E. Chatelain,\* Judges.

## REVERSED AND RENDERED.

Amy, J. dissents and assigns written reasons.

Chatelain, J., concurs and assigns written reasons.

\* Honorable David E. Chatelain participated in this decision by appointment of the Louisiana Supreme Court as judge *pro tempore*.

**Diane A. Sorola**
**402 W. Convent Street**
**Lafayette, LA 70501**
**(337) 234-2355**

**F. Shepton Hunter**
**708 South St. Antoine**
**Lafayette, LA 70501**
**(337) 230-9777**

**COUNSEL FOR PLAINTIFF/APPELLEE:**
      **Bradley Griffith**

**Julie Vaughn Felder**
**P.O. Box 80399**
**Lafayette, LA 70598**
**(337) 856-3444**

**Bradford H. Felder**
**G. Andrew Veazey**
**Huval, Veazey, Felder, Aertker & Renegar, L.L.C.**
**2 Flagg Place**
**Lafayette, LA 70508**
**(337) 234-5350**

**COUNSEL FOR DEFENDANT/APPELLANT:**
      **Resa Latiolais**

PETERS, J.

The basis of this litigation is a custody dispute between Bradley Griffith (Bradley) and Resa Latiolais (Resa), the parents of Cole Rolden Griffith (Cole). Resa appeals the custody judgment rendered by the trial court, asserting five assignments of error. For the following reasons, we reverse the trial court judgment in all respects, render judgment awarding Resa sole custody of the minor child, assess all costs of this litigation to Bradley, and establish a visitation schedule consistent with the findings of this opinion.

The record establishes that Cole is the product of an extramarital relationship—one which did not include the element of cohabitation. Still, the relationship must be classified as something more than casual as it lasted almost fourteen years.

Bradley is in his mid-fifties and is a financially successful Lafayette, Louisiana businessman. He has never married, although he has a fifteen-year-old daughter born to another extramarital relationship. He owns a retail store, a shopping center, an apartment complex, and rental properties from which he derives income. He has used his success to curry favor with various public officials, elected and unelected, and has used his influence with those officials when it met his needs. As found by the trial court in its reasons for judgment, Bradley seems to think that his financial success and political connections place him above the law and entitle him to do anything he pleases to accomplish the end he desires. The trial court also concluded in its reasons for judgment that Bradley is devious, manipulative, and retaliatory in his dealings with others, particularly women.

Resa is in her early forties, had previously been married, but is divorced. That marriage produced one child, Lana, and Resa maintained Lana's custody after the divorce.

Cole was born on November 19, 2001, and resided exclusively with Resa from his birth until after this litigation began. During that time, Resa took care of all Cole's needs, and the only contact Bradley had with the child during this period was his visits to Resa's home in the evening.[1] Although Bradley provided Resa with $1,600.00 to $1,800.00 per month to support Cole, the payments were sporadic at best, and often he would go weeks without paying her anything.

In the fall of 2004, Resa stopped being a stay-at-home mother and began attending Louisiana State University at Eunice, Louisiana. She progressed in her studies and was scheduled to receive an Associate of Science degree in Radiologic Technology in May of 2008. Cole began staying at a day care facility two to three days per week, and Resa still maintained full responsibility for the child's well-being as Bradley seemed fully satisfied with his position as an occasional visitor in his son's life.

At some point during 2005, the relationship between Bradley and Resa began to dissolve. Although Resa had apparently found a new love interest, she continued to accept Bradley as an occasional visitor for Cole's benefit, and took no steps to interfere with Bradley's involvement with his son. That is to say, Bradley set the parameters of his relationship with Cole, not Resa. It is from this background that this litigation began.

---

[1]Bradley testified that from the time of Cole's birth until the beginning of this litigation, he visited Resa's home every evening from 7:30 or 8:00 until 9:30 or 10:00 and would feed and bathe Cole as he got older. On the other hand, Resa testified that the visits were, at best, two or three evenings per week from 9:00 to 11:00 and that Bradley did nothing more than watch television with Cole. The trial court accepted Resa's version of the facts.

In September of 2005, Resa, Lana, and Cole evacuated Lafayette Parish with Resa's new love interest, Gregory Chappell, to escape the approach of Hurricane Rita. When they returned, Bradley picked up Cole and took him riding. A few days later, on October 5, 2005, Bradley filed a petition seeking to establish Cole's paternity and to be awarded Cole's sole custody. The single basis for his claim to custody was that Resa had "lately not made choices which are in the child's best interest and has been hurtful to the child."[2] Additionally, Bradley sought the appointment of a mental health professional to evaluate the parties. Although Bradley did not elaborate as to the particulars of Resa's "choices," the interrogatories attached to the petition make it clear that the litigation arose because of Resa's new love interest. The interrogatories sought the particulars of the evacuation, including the identity of all individuals with whom Resa left Lafayette Parish on September 21, 2005; where she and the fellow evacuees stayed from September 21 through September 24, 2005; and the sleeping arrangements of the evacuees during that time.

On October 10, 2005, Resa answered the petition, denying any allegation of poor choices and asserting that Bradley had failed to establish good cause for the appointment of a mental health professional. Additionally, she reconvened against Bradley, seeking both custody and an order of child support. Furthermore, she sought a protective order from the court prohibiting Bradley or a third party acting on his behalf from following and/or harassing her. She also filed interrogatories wherein she sought particulars concerning Bradley's allegations of poor choices and the need for professional evaluation. Additionally, she sought financial information from Bradley.

---

[2]No subsequent pleadings expounded on these allegations or added new allegations.

3

After the initial filings, this simple custody dispute became what can best be described as an extended procedural and evidentiary nightmare, based not on the events occurring before the October 2005 filing, but on events occurring contemporaneously therewith and thereafter. Six preliminary hearings and the Hearing Officer process of the Fifteenth Judicial District extended the time before trial on the merits to August 21, 2006.[3] The trial began on that day, but the thirteen days of evidence gathering were not completed until January 28, 2008.[4] The trial court then took the matter under advisement and issued written reasons for judgment two months later, on March 27, 2008.[5] Over five months later, on October 9, 2008, the trial court executed a judgment incorporating its reasons for judgment. Thus, what began as a simple custody proceeding took three years to resolve at the trial level.

The judgment executed by the trial court granted the parents joint custody, but did not designate a domiciliary parent. Instead, the judgment provided alternate weekly physical custody modified with a non-custodial parent overnight visit on Tuesday of each week and an alternating holiday schedule. Additionally, the judgment basically provided that the parents would be subject to the continuing instructions of certain professionals as to how Cole is to be raised. With regard to this latter point, the judgment provided the following:

---

[3]The trial court held hearings to consider preliminary matters on November 10, 2005; January 19, 2006; March 9, 2006; April 27, 2006; and May 1, 2006.

[4]The trial on the merits began on August 21, 2005, and was recessed first until August 23, 2006; next to December 18, 2006; next to January 8, 2007; next to January 9, 2007; next to March 5, 2007; next to March 7, 2007; next to April 30, 2007; next to July 19, 2007; next to January 23, 2008; next to January 24, 2008; next to January 25, 2008; and finally to January 28, 2008.

[5]The reasons for judgment consist of sixteen pages addressing the evidentiary issues and two additional pages attached to the reasons for judgment setting forth the trial court's determination as to the visitation schedule.

4

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED the parties *shall* continue co-parenting counseling sessions with Dr. Kenneth Bouillion at such intervals and for such period of time as Dr. Bouillion recommends.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the parties *shall* follow the recommendations of the mental health professionals in this case and they *shall* follow Dr. Kenneth Bouillion's recommendations with regard to co-parenting Cole and to assist them in communication problems.

. . . .

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that since RESA LATIOLAIS and Greg Chappell are now married, Mr. Chappell shall be brought into the co-parenting sessions, at his costs, so that relations can be improved between Mr. Chappell and BRADLEY GRIFFITH for the sake of the minor child.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that it is in the best interest of the minor child that BRADLEY GRIFFITH engage in counseling with Dr. Lynn Aurich, Ph.D., to address the issues set forth in the Court's "Reasons for Ruling" signed on March 27, 2008, at such intervals and for such period of time as recommended by Dr. Aurich.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that it is in the best interest of the minor child that RESA LATIOLAIS continue to engage in counseling with Margo Hasha to address the issues set forth in the Court's "Reasons for Ruling" signed on March 27, 2008, as well as the report of Dr. Lyle LeCorgne, Ph.D., at such intervals and for such period of time as recommended by Ms. Hasha.

. . . .

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Dr. Lyle LeCorgne *shall* remain involved in the case on an as-needed basis.

(Emphasis added.)

The judgment further provided that the cost of co-parenting sessions was to be shared equally between Resa and Bradley, while, at the same time, all counseling costs were to be borne by the party subject to the counseling.[6] Allocation of costs is an issue on

---

[6]The judgment does not address how the costs associated with Resa's husband, a non-party who cannot be assessed with costs, will be divided, nor does it address who will be responsible for Cole's counseling expenses.

appeal as is the provision in the judgment "that neither party shall engage in any form of corporal punishment of the minor child whatsoever."

In her appeal, Resa asserts five assignments of error:

1.  The trial court erred in failing to award custody to Resa, or alternatively, to appoint Resa the domiciliary parent and in awarding custody on 50/50 basis rather than a schedule of visitation with the child spending time primarily with Resa and with the father having alternating weekends, one day in the off week, and alternating holiday periods.

2.  The trial court erred when it ordered Resa to continue co-parenting sessions with Dr. Kenneth Bouillion, when it ordered the parties to follow Dr. Kenneth Bouillion's recommendations with regard to co-parenting Cole, when it ordered Resa to pay one-half of the cost of co-parenting sessions, when it ordered Greg Chappell [Resa's husband] to attend co-parenting sessions at his cost, when it ordered Resa to continue counseling with Margo Hasha at her cost, and when it ordered that Dr. Lyle LeCorgne remain involved in this case.

3.  The trial court erred in failing to require Brad to undergo further mental health evaluations to address the sociopathic qualities, character disorder, and possible sociopathic personality disorder that Owen Scott, Ph.D. stated would be demonstrated if the allegations that were ultimately proved to be true in this case were true.

4.  The trial court erred when it ordered that "neither party shall engage in any form of corporal punishment of the minor child whatsoever."

5.  The trial court erred in assessing costs equally between the parties.

**OPINION**

It is well settled that an appellate court cannot set aside a trial court's findings of fact in the absence of manifest error or unless those findings are clearly wrong. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). If the findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse those findings even though convinced that had it been sitting as the trier of fact, it would have

6

weighed the evidence differently. *Id.* Each child custody case must be viewed in light of its own particular set of facts and circumstances with the paramount goal of reaching a decision that is in the best interest of the child. *Barberousse v. Barberousse*, 556 So.2d 930 (La.App. 3 Cir. 1990). The best interest evaluation is fact-intensive and requires the weighing and balancing of factors favoring or opposing custody of the competing parties on the basis of the evidence presented in each case. *Romanowski v. Romanowski*, 03-124 (La.App. 1 Cir. 2/23/04), 873 So.2d 656. The trial court is vested with broad discretion in deciding child custody cases and its decision will not be disturbed absent a clear abuse of discretion. *Bagents v. Bagents*, 419 So.2d 460 (La.1982); *Stephens v. Stephens*, 02-402 (La.App. 1 Cir. 6/21/02), 822 So.2d 770. However, as recognized by our supreme court, "[a]n award of custody is not a tool to regulate human behavior." *Everett v. Everett*, 433 So.2d 705, 708 (La.1983). In this case, we find no manifest error in the trial court's factual findings. We do find, however, that the trial court abused its discretion in effecting its joint custody judgment.

### *ASSIGNMENT OF ERROR NUMBER ONE*

In its reasons for judgment, the trial court properly cited the law to be applied in considering a child custody dispute. It first recognized that La.Civ.Code art. 131 requires that the award of custody be based on the best interest of the child. The trial court also recognized that when parents cannot agree as to a custody arrangement, La. Civ.Code art. 134 provides twelve relevant factors the court "shall" consider in determining the best interest of the child. Those factors are as follows:

> (1) The love, affection, and other emotional ties between each party and the child.

7

(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.

(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.

(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.

(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.

(6) The moral fitness of each party, insofar as it affects the welfare of the child.

(7) The mental and physical health of each party.

(8) The home, school, and community history of the child.

(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.

(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.

(11) The distance between the respective residences of the parties.

(12) The responsibility for the care and rearing of the child previously exercised by each party.

In considering these factors, the trial court stated the following in its reasons for judgment:

Up until the time BRAD instituted these proceedings, RESA was clearly the primary caretaker of the minor child. She saw to his day-to-day care, including medical and dental appointments. The child was virtually in her care at all times, with the exception of daycare twice weekly, which commenced in the fall of 2004. BRAD admittedly only visited the child at RESA's home approximately three (3) times per week, during which time he would eat supper, and/or lie on the sofa and watch television with Cole. BRAD never took the minor child to any medical or dental appointments and the child only spent the night with him on one (1) occasion at the time this matter was instituted.

While the Court finds that the parties are fairly even on the remaining factors, they have both fallen woefully short in encouraging a close and continuing relationship between the minor child and the other parent. Though BRAD has claimed to want a good working relationship with RESA, and even paid for co-parenting therapy, he has engaged in an intentional pattern of conduct designed to place her under severe stress and destabilize her life. Also, BRAD has appeared to follow this Court's suggestions throughout this litigation while surreptitiously setting his own agenda. Further, BRAD has shown a propensity to manipulate people, especially females, to fulfill his agenda of winning custody, while at the same time crushing RESA psychologically, financially and criminally.

Thus, in one sentence, the trial court balanced the factors of La.Civ.Code art. 134 equally between the parties, finding that both parents had "fallen woefully short" of their parental obligations toward each other. Yet, in the remainder of the paragraph, the trial court recognized that this uncooperative atmosphere arose from Bradley's unilateral actions and that his actions made cooperation next to impossible.

In her first assignment of error, Resa asserts that the trial court erred in not awarding her sole custody. We agree. In reaching this conclusion, we find that this litigation evolved into two separate lawsuits, one of which is not even supported by any pleadings, but that when both factual scenarios are considered, the result is the same—the trial court abused its discretion in effecting the equal sharing, joint custody judgment based on the facts before it.

### *Evidence Addressing Pleadings' Issues*

In order to institute a lawsuit against a defendant, the plaintiff who files a petition must identify the parties and set forth the basis for the lawsuit. La.Code Civ.P. art. 891. The basis of any lawsuit consists of "a short, clear, and concise statement of all causes of action arising out of, and of the material facts of, the transaction or occurrence that is the subject matter of the litigation." La.Code Civ.P.

art. 891(A). The problem with this litigation is that the original custody issue became intertwined with the events that followed, and resolution of the original issue became a secondary goal. The only issues that should have been before the trial court by virtue of the pleadings are Bradley's complaints of Resa's pre-litigation behavior—because those issues are the only ones addressed in the pleadings.[7] In addressing these two issues, the trial court reached the same conclusion as has been previously stated in the opinion—that in reality, Bradley's true complaint was jealousy over Resa's new romantic interest, and his custody request was a way of punishing Resa. When the background of his vague allegations finally came to light at trial, his initial complaints were twofold:

1. While in Mississippi escaping from Hurricane Rita, Resa engaged in sexual relations with Gregory Chappell in Cole's presence, and;

2. Resa had physically abused Cole.

The trial court factually concluded that neither allegation was supported by the evidence. With regard to the sexual issue, the trial court noted that none of the mental health professionals involved in the litigation concluded that Cole witnessed any sexual conduct between his mother and anyone else, and that Resa specifically denied the allegation. With regard to the physical abuse issue, Bradley complained at trial that Resa and her father had spanked Cole at his third birthday party. The trial court found Bradley's testimony on this point to not be credible given the fact that any such event would have occurred eleven months before Bradley instituted his action. Thus, the trial court concluded that the abuse claim was nothing more than an afterthought to support Bradley's suit.

---

[7]As previously indicated, even those issues are vaguely presented.

10

Applying these factual findings to the factors set out in La.Civ.Code art. 134, the factors balance overwhelmingly in Resa's favor. Louisiana Civil Code Article 134(1) balances in her favor because Bradley's commitment was a passing interest in Cole while Resa's was that of a true parent, and the more significant emotional tie was between the child and his mother. With regard to La.Civ.Code art. 134(2), Bradley played no part in Cole's education and rearing and, although he later professed to have found religion, spiritual guidance at the time these issues were raised was provided exclusively by Resa. While Bradley, through his superior financial position, was providing sporadic support to Cole, Resa was the party actually providing food, clothing, medical care, and other material needs. Therefore, Bradley has no advantage through the application of La.Civ.Code art. 134(3). Clearly La.Civ.Code art. 134(4) also balances in Resa's favor in that Cole had lived with her his entire life in a stable, adequate environment and, as pointed out by the trial court in its reasons for judgment, Bradley's contribution was to visit in the evening and enjoy the easy part of raising a child. Furthermore, while Bradley could provide a custodial home for Cole, the permanency factor of La.Civ.Code art. 134(5) also balances in Resa's favor. With regard to the moral fitness issue found in La.Civ.Code art. 134(6), Bradley and Resa maintained an extramarital relationship for years without considering marriage. In fact, Bradley's complaint as to Resa's moral decisions is a rather strange position given the fact that he had maintained a similar extramarital relationship with Resa for such a long period of time. At the time this matter was filed, La.Civ.Code arts. 134 (7), (8), (9), and (11) would have played no part in the trial court decision. Both parents were in good physical health, and there was no evidence of either having mental issues; Cole was not of school age, and his

school, home, and community history revolved around his mother; Cole was not of the age that he could have offered a reasonable preference; and the distance between the respective residences of the parties was not significant. With regard to La.Civ.Code art. 134(10), the trial court factually found that before this litigation began, Resa made Cole available to Bradley at all times, even allowing Bradley to come to her home on the average of two to three evenings per week to eat, relax, and visit with Cole. Finally, La.Civ.Code art. 134(12) clearly balances in Resa's favor as she previously bore the full responsibility of caring for Cole. Bradley's testimony at the trial clearly demonstrates that he delegated this responsibility to Resa:

> Q.  Okay. Isn't it true that prior to that time the child had only spent one night at your house from his entire birth?
>
> A.  He was still a very small child.
>
> Q.  Well, you left him with her, didn't you?
>
> A.  She was the mother - -
>
> Q.  She was the primary caretaker, correct?
>
> A.  She was his mother, yeah.

Thus, had the trial on the merits addressed only the issues raised by the pleadings, judgment would have been rendered in Resa's favor.

### *Evidence Addressing Issues Arising after Issue was Joined*

Unfortunately, the trial continued for well over a year. Instead of focusing on the issues presented by the pleadings, and despite the fact that no facts pointed to the need for their involvement, the litigation became entangled with continuous evaluations by and recommendations of mental health professionals. Although Resa concurred in some of this involvement, the experts' contributions were basically at Bradley's insistence. Concurrent with the experts' involvement, Bradley accelerated

12

an already mean-spirited, underhanded, and dishonest campaign to improperly influence the outcome of the litigation. The most telling aspect of this entire record is that, from beginning to end, it has never seemed to bother him that most of what he has accomplished is totally counterproductive to any claim he may have to being a good role model for his son. In fact, it establishes a record that reflects a parent with few socially redeeming characteristics to pass on to his son.

We must now evaluate the trial court judgment in light of subsequent events that improperly expanded the issues and impacted the ultimate result. In doing so, we conclude that consideration of the remainder of the evidentiary record further establishes that Resa should have been awarded Cole's sole custody.

Most of the trial court's sixteen-page reasons for judgment are dedicated to documenting Bradley's numerous attempts to improperly influence the outcome of the litigation. Just some of the activities highlighted in the trial court's reasons for judgment include Bradley reporting Resa to the State of Louisiana on October 6, 2005, (the day after he filed this suit) for allegedly having improperly obtained a medical card and food stamps to support Cole during those times when Bradley's support checks were not forthcoming; using two female acquaintances, Jan Huffman and Jessica Harbin,[8] to involve themselves with Resa's sixteen-year-old daughter in an effort to turn the daughter against her mother;[9] using the same two women to otherwise cause Resa severe emotional stress and anxiety;[10] having a private

---

[8]Jan Huffman is Jessica Harbin's mother.

[9]This intervention in the mother/daughter relationship resulted in Lana being interviewed by law enforcement officials, making and recanting statements about her mother's activities, and ultimately moving to her father's home because of the strain placed on the relationship with her mother.

[10]Bradley engaged in this subterfuge after being specifically admonished by the trial court to distance himself from these two women. However, the trial court factually concluded that at

13

detective, Robert Williamson, accompany him to Cole's day care facility on a number of occasions, where they made insinuating inquiries concerning the owners of the facility, resulting in the owners refusing to accept Cole at the facility; attempting to pressure a juvenile officer, directly and through the personal intervention of a Louisiana State Senator, to file a child abuse charge against Resa despite the officer's finding that no evidence supported the charge; staging confrontations with Resa and enlisting the improper assistance of law enforcement personnel during those confrontations to try to discredit Resa; and by joining Resa's church with the intent to harass her, drive her from the church, and curry favor with the trial judge.

The extent of Bradley's disregard for the court itself is evidenced by the fact that the trial court had directed him to not interfere with Cole's stay at this particular day care facility and had directed him to distance himself from Jan Huffman and Jessica Harbin. Bradley disregarded these directives. As summarized by the trial court in its reasons for judgment, Bradley and his private investigator "sabotaged the situation" at the day care center. Additionally, the trial court found factually that Bradley continuously manipulated and controlled the two women to do his bidding in efforts to discredit Resa.

Bradley's arrogance toward all who opposed him and his disdain for the justice system in general is evidenced by his attempt to pressure Juvenile Officer Alex Montgomery, III, to make a finding of child abuse against Resa despite the total lack of evidence of abuse. The trial court factually found that Bradley even used his personal influence with a Louisiana State Senator and had the Senator personally contact Officer Montgomery and encourage him to file a bogus criminal charge

Bradley's instruction, the two women stalked Resa, made harassing telephone calls to her, and filed false criminal charges against her.

14

against Resa. The one individual who remained above the fray was Officer Montgomery, who completed his investigation, concluded that charges were not warranted, and closed the investigation. It obviously did not bother Bradley that his false allegations subjected his own child to interviews with police officers and representatives of the State of Louisiana, Office of Community Services.

As pointed out by the trial court, even something as deeply personal as the practice of one's religion was not exempt from Bradley's manipulative ways. Before this litigation began, Bradley apparently had no religious affiliation, but Resa and Cole regularly attended the First Baptist Church in Lafayette, Louisiana. After filing suit, Bradley began attending Resa's church. The trial court found factually that attending this particular church was less about a religious experience and more about an effort to "garner favor with [the trial court] and to sully RESA's reputation." In support of that conclusion, the trial court made the following factual findings:

> Once he joined the church, BRAD set about to ingratiate himself with the pastor, Perry Sanders, by personally handing him donations comprised of cash and checks. Also, BRAD wore a yellow [royal blue] bracelet to church which he explained to church members was a demonstration of support for victims of child abuse, which included Cole at the hands of RESA. BRAD chose to sit in close proximity to RESA in the church sanctuary to place pressure on her during the church services, eventually resulting in her leaving the church and joining another local Baptist church. The Court also finds the statement made by the mother of BRAD's other child, Cindy Hebert, in a telephone conversation with attorney Julie Vaughn Felder which occurred on August 15, 2006, to be credible. In that conversation, Ms. Hebert indicated that the reason BRAD became involved with First Baptist Church and Reverend Perry Sanders was he believed that this Court would be "crazy" to go against a minister of a church of 10,000 people in this community.

[Footnote omitted.]

15

The trial court also found that on November 30, 2005, Bradley orchestrated an incident between Resa and Cindy Hebert[11] at the Opelousas General Hospital with the help of Officer Roylis Brent Gallow of the Opelousas Police Department.[12] In its reasons for judgment, the trial court described what occurred that day:

> That morning BRAD was bringing the minor child to Opelousas General Hospital for some lab tests associated with a urinary tract infection and was to meet RESA at the hospital. Because of their past acrimony, the Court believes BRAD was confident that if he brought Cindy Hebert with him, that RESA would become upset and lose control. Further, he wanted to document RESA's conduct by having Officer Gallow present as a witness. Again, this was a manipulation by BRAD to bait RESA into acting inappropriately in a public place and to document her actions. Sadly, RESA predictably took the bait and actually battered Cindy Hebert in the process by shoving her with her elbows as RESA held Cole in her arms. Again, all of this occurred in the presence of the minor child, and was yet another traumatic experience for him involving parental conflict and police officers.

In its reasons for judgment, the trial court also found that Bradley attempted to coach Cole before the child was interviewed by the mental health professionals and that on more than one occasion, he "has spoken negatively about RESA and Mr. Chappell in the child's presence." The record also establishes that the involvement of many of Bradley's witnesses was encouraged by gifts that can only be described as out-and-out bribes.[13]

All these efforts by Bradley were continuous from the time the initial pleading was filed until the end of trial. Bradley used the recess periods during the year and four month trial to create new issues. His antics resulted in a multitude of reciprocal

---

[11]Ms. Hebert is the mother of Bradley's fifteen-year-old daughter.

[12]Officer Gallow is the brother of Opelousas Police Chief Perry Gallow. The Police Chief is described at trial as Bradley's political friend.

[13]The record establishes at a minimum that Robert Williamson's daughter received a free dress for his help; Lana received two pair of jeans and two shirts; and Jessica received $40.00 and gasoline for her efforts in harassing Resa.

protective filings generated by not only the litigants, but also the participants in Bradley's various schemes. They included temporary restraining orders, criminal charges both bogus and real, and numerous altercations between the parties and the players in this drama. The trial court factually found little or no merit in any of Bradley's assertions and allegations and voiced dismay at Bradley's continuing improper antics. Despite the trial court's frustration, Bradley suffered no penalty for his activities or for disregarding the trial court's specific instructions.

After dedicating most of the sixteen pages of its reasons for judgment to document Bradley's activities, the trial court found little basis on which to criticize Resa. At worst, the trial court concluded that Resa's attempt to better herself by enrolling in college affected her parenting skills and that her reaction to Bradley's antics *after* the filing of the original petition were "extremely troubling." Specifically, the trial court concluded that while her efforts to better herself through education were "laudable," her misuse of the food stamp and medical benefit system was inappropriate and her emphasis on gaining her degree "severely diminished" her ability to manage and care for Cole. The trial court also found that Resa's removal of Bradley's name from a day care sheet and replacing it with Gregory Chappell's, her instruction to Cole's pediatrician not to provide Bradley with medical records or information about Cole, and her efforts to place her new husband "in the role of her protector in situations with BRAD" were counterproductive.

We find no manifest error in the trial court's factual findings. We do, however, find error in the trial court's equal balancing of Resa's actions against Bradley's transgressions. While Resa may not have always made the best choices, it is difficult for this court to criticize a woman who wants to better herself through education

17

rather than living off the charity of a manipulative and controlling former lover. In fact, there is evidence that Bradley acquiesced in her seeking food stamps and a medical card.[14] The other activities for which she was criticized all arose after Bradley enlisted the assistance of his two female friends, various police officers, a Louisiana State Senator, Resa's own daughter, a Baptist preacher, and a whole host of mental health experts, all with the singular purpose of discrediting her without regard for the truth. Viewed in the context of Bradley's activities, one can understand her negative response to her surroundings.

The involvement of the various mental health experts in this litigation does not change our opinion that the trial court abused its discretion in the balancing process. The experts' involvement came very early in the litigation as the trial court signed an order on November 28, 2005,[15] appointing Dr. Lyle LeCorgne, Ph.D., a Lafayette, Louisiana clinical psychologist, to evaluate Bradley, Resa, Cole, and Lana. The trial court later expanded this order of evaluation to include Gregory Chappell and Cindy Hebert. Dr. LeCorgne issued a written report of his findings and recommendations on April 27, 2006. In his report, Dr. LeCorgne recommended that Cole undergo counseling and that Resa's visitation be supervised until Dr. LeCorgne concluded that she had progressed sufficiently in individual therapy to lift the supervision. Almost one year later, at a March 7, 2007 hearing, Bradley and Resa agreed to participate in co-parenting counseling with Dr. Kenneth Bouillion, Ph.D., a Lafayette, Louisiana psychiatrist.

---

[14]We recognize that the trial court factually found no evidence of that involvement, but given Bradley's credibility, it is difficult to believe otherwise.

[15]This order came less than two months after the initial petition was filed and long before the basic issues were addressed by the trial court.

At the May 1, 2006 hearing, Bradley also agreed to undergo psychological evaluation by a professional of Resa's choosing, and the evaluation was ultimately performed by Drs. Owen Scott, Ph.D., and Mary Lou Kelly, Ph.D., both clinical psychologists from Baton Rouge, Louisiana. These professionals issued a written report on August 17, 2006, in which they found that "both parents are adequately competent and motivated," but strongly recommended "that both parents, and especially Mr. Griffith stop creating a climate of conflict and accusation." Their recommendation was that Cole spend alternating weeks with each parent, suggesting that "this arrangement will equalize the power between the parents and require them to cooperatively and collaboratively parent Cole." However, they also recommended that should the court choose to have one parent be the domiciliary parent, it should be Resa "given her history of being the primary caretaker and her willingness to have a balanced attitude towards Mr. Griffith," then stated that, by contrast, Bradley appeared to be "dedicated toward vilifying" Resa. While we question the need of these experts given the basic allegations of Bradley's pleadings, even they recognized Bradley's true character and motivation.

In summary, the trial court found factually that Bradley is devious, manipulative, and retaliatory, and that these base characteristics particularly come to the surface in his dealings with women; that he had little or no involvement in Cole's life prior to filing this suit; that not only was the initial suit without merit, but Bradley's motivation for filing the suit was not Cole's best interest, but jealousy; and that Bradley was engaged in a continuing campaign to discredit Resa and influence the trial court decision without regard to the dishonesty of his tactics or the falsity of his assertions. On the other hand, the trial court found that Resa bore the singular

19

responsibility for raising Cole from his birth until after this litigation began; that during that time, she allowed and encouraged Bradley's involvement in Cole's life; that she began an attempt to better educate herself to become more independent of her manipulative former lover and to better care for her son; and that her retaliatory actions between the filing of suit and judgment were directly in response to Bradley's antics.

Despite the overwhelming evidentiary findings in Resa's favor, the trial court still awarded Bradley an equal-sharing custody arrangement—a judgment that is inconsistent when compared to the factual findings. In the same paragraph of its reasons for judgment, the trial court points out that Resa was "clearly" Cole's primary caretaker; then criticized her for having "a problem with dependency on men"; and at the same time, criticized her for attempting to become independent from Bradley by pursuing an education. In another paragraph, the trial court criticized Resa's unwillingingness to "facilitate a close and continuing relationship between Cole and his father" without mentioning the background giving rise to Resa's reluctance to deal with Bradley on any level. In still another paragraph, the trial court criticized Resa for allowing her new husband, Gregory Chappell, to assume the role of her protector from Bradley.[16] While placing much emphasis on Resa's after-the-fact attempt to protect herself from Bradley's constant assault, the trial court also concluded that it was concerned with Resa's difficulty in dealing with "her issues of passivity, dependency, approval seeking, people pleasing and her tendency to be manipulated by others."

---

[16]There are many who would argue that protecting one's wife is one of the marriage vows. That vow is particularly significant in this particular case, since many of those who are given the societal obligation to protect Resa appeared to be working hand-in-glove with Bradley.

With regard to Bradley's development, the trial concluded only that Bradley had "improved over the course of the litigation." At the same time, the trial court expressed that it was "*extremely concerned* that unless BRAD acknowledges his manipulative behavior that he will not change."[17] (Emphasis added.)

We recognize that La.R.S. 9:335(A)(2)(b) provides that to the extent it is feasible and in the best interest of a child, physical custody of a child should be shared equally between the parents. However, that mandate is tempered by La.Civ.Code art. 132, which provides that "if custody in one parent is shown by clear and convincing evidence to serve the best interest of the child, the court *shall* award custody to that parent." (Emphasis added.) The discussion in this opinion to this point, and the primary discussion in the trial court's reasons for judgment, has centered primarily on the parents and their character strengths and faults. While those facts must play a part in the ultimate decision on custody, Cole's best interest is the paramount consideration. The facts concerning his situation also balance in favor of Resa.

The record establishes that for the first four years of his life, Cole was a well-adjusted, happy child. Unfortunately, Cole then became his father's pawn in these proceedings—first as a weapon to express his father's jealousy toward his mother, and finally as a prize to be gained in a no-holds-barred attack on his mother and the integrity of our judicial system. Clearly, Cole suffered from this litigation, and giving his father equal access without a clear showing that Bradley has changed (not just a hope for the future) is a guarantee of future difficulties. In fact, the trial court

---

[17]The record contains no evidence that Bradley has ever recognized his character defects that clearly came to the surface in this litigation.

21

concluded as much when it expressed its concerns over Bradley's refusal to recognize the error of his manipulative ways:

> The Court finds it troubling that Cole, who has been described as a very intelligent young man, will learn how to manipulate people, especially women, and use political connections and favors as a means of getting ahead in life. The Court has concerns that this manipulative and exploitive behavior on the part of BRAD is a long-standing pattern.

However, instead of recognizing that this concern alone justifies denying Bradley equal access to Cole, the trial court attempted to preclude this problem by ordering continuing counseling. Cole's best interest is not served by the hope that Bradley will change his character in the future.

Application of the factors set out in La.Civ.Code art. 134 to the factual findings on the issues raised and litigated outside the pleadings causes us to reach the same result as before—the factors balance overwhelmingly in Resa's favor.

While Cole is no longer a passing interest in Bradley's life, the custody awarded to Bradley is nothing more than a victory over his former lover, and, despite the overwhelming disruption of the mother/child relationship, Resa has shown herself to be the true parent with a more significant emotional tie to Cole. Therefore, La.Civ.Code art. 134(1) still balances in her favor. With regard to La.Civ.Code art. 134(2), Bradley attempted to purchase his religious status and then used it to spread falsehoods about Resa. Additionally, his manipulation of the day care situation reflects a desire to control, not enhance, Cole's education opportunities. Thus, his religious and educational interest in Cole is shallow at best and nonexistent at worst. Bradley's superior financial situation still exists, but he has shown that he is more willing to use that situation to get his way rather than to financially support his child. Therefore, Bradley still has no advantage under the application of La.Civ.Code art.

134(3). Clearly La.Civ.Code art. 134(4) continues to fall in Resa's favor. Before this litigation began, Cole lived with her his entire life in a stable, adequate environment. The responsibility for the disruption of that environment and Cole's emotional problems that arose thereafter lies totally with Bradley. Despite being confronted with a conspiracy of Bradley's underlings, public officials, law enforcement, and even her own minister, Resa continued to persevere—continuing her educational program, attending all sorts of mandated psychological evaluations and counseling sessions, and still offering Cole stability when he was with her. Bradley's approach was to involve Cole with bogus claims and use him in every way possible as reflected by the "child abuse" wrist band he so openly wore to the church services. Furthermore, while Bradley can still provide a custodial home for Cole, his antics have destroyed the permanency factor, which most would consider important for the rearing of a child. Thus, La.Civ.Code art. 134(5) continues to balance in Resa's favor. The moral fitness factor found in La.Civ.Code art. 134(6) now balances overwhelmingly in favor of Resa. Bradley's antics, as clearly articulated by the trial court, make it abundantly clear that the trial court's description of him as devious, manipulative, and retaliatory in his dealings with others is directly on point. Additionally, the trial court's conclusion that, during the litigation, Bradley had "shown a propensity to manipulate people, especially females, to fulfill his agenda of winning custody, while at the same time crushing RESA psychologically, financially and criminally" is also an accurate description. Little has changed concerning the application of La.Civ.Code arts. 134 (7), (8), (9), and (11) although, given Bradley's obsession with gaining custody, some may question his mental balance. Still, both are in good physical health and, although Cole is now of school age, the distance between the households makes transportation

23

a minimal problem. However, Cole is still not of the age that he could have offered a reasonable preference. With regard to La.Civ.Code art. 134(10), availability of Cole to either parent had been dictated by the trial court since the litigation began in earnest. Finally, La.Civ.Code art. 134(12) balances in Resa's favor as she previously bore the full responsibility of caring for Cole.

As we read the trial court's reasons for judgment, its intent is less a resolution of the issues presented and more of an attempt to regulate the behavior of the parties—primarily Bradley. This intent is supported by the trial court's "sincere hope that both parties will heed the testimony of Dr. Bouillion" and follow the seven factors the doctor suggests are the keys to resolving their differences. This approach substitutes resolution of the parents' problems for Cole's best interest. Placing the emphasis on Cole and not the parents mandates that Resa be awarded sole custody.[18]

The clear and convincing evidence in this matter is that Bradley has not changed. While it is commendable to attempt to effect a solution for what may happen in the future, this matter must be decided on the facts now before the court. That being the case, and considering the factors found in La.Civ.Code art. 134, we find that the trial court abused its discretion in rewarding Bradley with a favorable judgment when his sole goal has been to subvert the very system of justice to which we adhere. Although Resa did not plead it as a defense,[19] the matter before us is much like the hornbook law "clean hands doctrine." That doctrine, which is alive and well in Louisiana, provides that "[a] person cannot maintain an action if, in order to establish his cause of action, he must rely in whole or in part, on any illegal or

---

[18]We also recognize that in Resa's initial pleading, she asked only for joint custody. However, given the record as a whole, we find that the "best interest" requirement of La.Civ.Code art. 132 mandates an award of sole custody.

[19]The pleadings by both parties leave much to be desired in every respect.

immoral act or transaction to which he is a part." *Allvend, Inc. v. Payphone Comm'ns Co., Inc.*, 00-661, p. 6 (La.App. 4 Cir. 5/23/01), 804 So.2d 27, 30. If there ever was a case of an individual who was totally immersed in illegal or immoral activity to establish a cause of action, it is Bradley. We reverse the joint custody award and award sole custody to Resa.

### *ASSIGNMENT OF ERROR NUMBERS TWO AND THREE*

Resa's second assignment of addresses the trial court's orders requiring continuing post-trial participation with the mental health experts who became involved in the litigation. Specifically, she asserts that it was error to require continuing co-parenting sessions with Dr. Bouillion, that it was error to require the parents to follow his recommendations in raising Cole, that it was error to require her to pay one half of the cost of counseling, that it was error to order her husband to attend co-parenting sessions, that it was error to require her to continue counseling with Margo Hasha, and that it was error to order that Dr. LeCorgne remain involved in the matter. In her third assignment of error, Resa asserts that the trial court erred in not requiring Bradley to undergo further evaluations in order to determine whether he suffers from sociopathic personality disorder. We agree that the second assignment of error has some merit, and, based on the relief we grant, the other issues raised in these assignments of error are rendered moot.

In custody matters, the trial court has the inherent power to tailor a custody decree in such a manner that it both accords with the child's best interest and minimizes any risk of harm to the child. *Beene v. Beene*, 43,845 (La.App. 2 Cir. 10/22/08), 997 So.2d 169. Therefore, it follows that a trial court's determination in regard to custody matters is entitled to great weight on review and will not be

reversed absent a clear abuse of discretion. *Gremillion v. Gremillion,* 07-492 (La.App. 3 Cir. 10/3/07), 966 So.2d 1228. However, as previously stated, "[a]n award of custody is not a tool to regulate human behavior." *Everett*, 433 So.2d at 708.

The use of expert witnesses is governed by La.Code Evid. art. 701, *et.seq.* With regard to the relationship between the trial court and the expert witness, La.Code Evid. art. 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In custody matters, La.R.S. 9:331 gives the trial court authority to "order an evaluation of a party or the child in a custody or visitation proceeding for good cause shown. The evaluation shall be made by a mental health professional selected by the parties or by the court." Still, the involvement of the expert testimony in a custody case must be limited to assisting the trier of fact as allowed by La.Code Evid. art. 702.

In our review of expert testimony, we note that "[t]he effect and weight to be given expert testimony is within the broad discretion of the trial judge." *Pendleton v. Barrett*, 97-570, p. 4 (La.App. 3 Cir. 12/23/97), 706 So.2d 498, 501. Furthermore, a trial court is not bound by expert testimony; the court has the power to substitute its own judgment and common sense for the conclusion of an expert witness where the evidence as a whole warrants doing so. *Ryan v. Zurich Am. Ins. Co.*, 07-2312 (La. 7/1/08), 988 So.2d 214.

The issue before us, however, is not the effect and weight given the experts' testimony, but the trial court's mandate that the parties delegate their right to make

26

parental decisions to the mental health care professionals on a continuing basis. We find no statutory authority for continued mandatory professional involvement after judgment, *as set forth in the trial court judgment,* and reverse those portions of the trial court judgment. In reaching this decision to reverse the order of continued professional involvement in this litigation, we do acknowledge that La.R.S. 9:358.1(A) provides that a parenting coordinator may be appointed by the trial court upon its own motion or that of a party if proof of good cause is shown for the appointment. The term of the appointment is one year, but may be extended for good cause. La.R.S. 9:358.1(B). The statutory parenting coordinator's duties consist of "assist[ing] the parties in resolving disputes and in reaching agreements regarding children in their care" on a variety of issues. La.R.S. 9:358.4. However, a parenting coordinator may only be appointed "if the court has previously entered a judgment establishing child custody, other than an ex parte order." La.R.S. 9:358.1(A). The comments to this statute note that "[t]he purpose of this limitation is to prevent the court from using the parenting coordinator process as a means of abdicating its responsibility to make the initial custody determination." La.R.S. 9:3581.1 Comments - 2007(b). The effect of the trial court's continued co-parenting counseling and the requirement that the parents implement the instructions of the various mental health professionals in this matter has the effect of appointing a parenting coordinator without having first entered a judgment establishing the custody of Cole and with more authority than statutorily authorized. Furthermore, it has the effect of the trial court improperly abdicating its obligation to make the initial custody determination to Dr. Bouillion and the other mental health professionals.

27

Our reversal of those provisions of the judgment render moot the other issues raised by these assignments of error.[20] Therefore, we need not consider them.

### *ASSIGNMENT OF ERROR NUMBER FOUR*

Bradley has tried to make this issue a cornerstone of his claim for custody since the beginning of this litigation. As previously stated, one of his two initial claims was that Resa and her father had physically abused Cole by spanking him some eleven months before he filed suit. As also previously stated, the trial court found no merit in this assertion. When that approach was not successful, Bradley began to use his fellow conspirators to make a case for child abuse. Despite his best efforts to entice and bribe individuals to conjure up child abuse allegations,[21] the best he was able to produce was evidence that, on occasion, Resa used corporal punishment on Cole that left small bruises. Based solely on the opinions of the mental health experts, the trial court prohibited corporal punishment as a means of discipline in all respects. In doing so, the trial court stated the following:

> All of the mental health professionals in this matter found RESA's methods of corporal punishment to be inappropriate and ineffective in disciplining Cole. Dr. LeCorgne opined that a time-out is a two-fold punishment which allows a child to experience being in control of his behavior so that he can be encouraged, rewarded and praised. Dr. Bouillion indicated, the next step is to remove privileges, and finally, to ground the child. As Dr. LeCorgne stated, for RESA to use corporal punishment by striking the child with a spoon to enforce time-out, is incompatible with the theory of time-out. Dr. LeCorgne found RESA's use of the spoon to be in indicator that she was angry, and no longer disciplining the child, but merely letting off steam. Corporal punishment should only be used as an attention getter when the child is engaging in behavior that is harmful or unsafe. While RESA's actions do not rise to the level of child abuse, the Court finds that they constitute excessive and inappropriate discipline.

---

[20]We recognize that Resa may have incurred counseling expenses since rendition of the trial court judgment, but the nature of the devolutive appeal prohibits relief for those expenses.

[21]All of these allegations of child abuse were found to be totally without merit.

Regardless of the experts' opinion on this issue, we cannot agree with the trial court's complete rejection of corporal punishment. In fact, the first circuit, in *Mason v. Hadnot*, 08-2015 (La.App. 1 Cir. 2/13/09), 6 So.3d 256, noted that corporal punishment is permitted in Louisiana when used by a parent to punish a minor child and the punishment used is reasonable. In reaching this conclusion, the first circuit relied on La.R.S. 14:18(4), which provides that "reasonable discipline of minors by their parents, tutors or teachers" is "justifiable, although otherwise criminal," and La.Civ.Code art. 218, which provides that the parents of an unemancipated minor "have the right to correct him, provided it be done in a reasonable manner."

When an expert's opinion conflicts with Louisiana law, the court is obligated to apply the law regardless of its personal views.[22] To do otherwise would leave parents, tutors, teachers, and even law enforcement and prosecutors in a quandary concerning the issue. Again, as pointed out in *Everett*, 433 So.2d 705, we must be careful not to use the custody proceedings as a means of regulating human behavior.

We reverse that portion of the judgment prohibiting corporal punishment.

### *ASSIGNMENT OF ERROR NUMBER FIVE*

In her final assignment of error, Resa argues that the trial court erred in assessing costs equally between the parties. While we note that La.Code Civ.P. art. 1920 allows the trial court to assess costs against any party and in any manner it considers equitable, except as otherwise provided by law, the assessment in this matter was based on the judgment awarding equal custody. Given our decision to

---

[22]Many books have been written with various theories of punishment for children. In fact, the most widely read Book of all time is in direct conflict with the opinions of the professionals in this litigation. *See Proverbs* 13:24, 22:15, 23:13, 23:14, and 29:15. It is sufficient to say that each child brings into this world his or her own challenges when it comes to discipline, and that no single method is right (or wrong) for all.

reverse the trial court judgment in full, we also reverse the assessment of cost and assess all costs of these proceedings to Bradley.

## *VISITATION SCHEDULE*

Having determined that Resa is entitled to sole custody, and thereby having set aside the joint custody plan instituted by the trial court, we turn to Bradley's visitation schedule. In its reasons for judgment, the trial court set forth a visitation schedule which, when coupled with the joint custody judgment, set forth all the days of visitation by the non-custodial parent. We modify the original sharing arrangement to provide that Resa shall have sole custody, and Bradley shall have visitation on the first and third weekends of each month from 6:00 p.m. on Friday until 8:00 p.m. on Sunday of each weekend. The first weekend of each month shall be defined as the weekend beginning with the first Friday of each month. As to holiday visitation, we maintain the trial court's holiday periods and allow Bradley visitation in even numbered years for the first half of the Mardi Gras Holiday, the first half of the Easter/Spring Break, the first half of Thanksgiving, and the Christmas Holiday. In odd numbered years, Bradley shall have visitation on the second half of the Mardi Gras Holiday, the second half of the Easter/Spring Break, the second half of Thanksgiving, and the New Year's Holiday. Additionally, Cole shall spend every Father's Day weekend with his father on the same time periods set for weekly visitation, and in the event Mother's Day falls on Bradley's visitation weekend, he shall forfeit that weekend and Cole shall spend Mother's Day weekend with his mother. Finally, we award Bradley visitation for three weeks in the summer vacation period, beginning at 6:00 p.m. on the first Friday of July and ending at 6:00 p.m. on the third Sunday of the said month.

## DISPOSITION

For the foregoing reasons, we reverse the trial court judgment awarding Bradley Griffith and Resa Latiolais joint custody of Cole Rolden Griffith and render judgment awarding sole custody of the minor child to his mother, Resa Latiolais; we reverse those portions of the trial court judgment ordering that the parties and Resa Latiolais's current husband continue in post-judgment counseling and follow the recommendations of the mental health professionals in raising their son; we reverse the trial court judgment prohibiting the use of corporal punishment in raising Cole Rolden Griffith; we reverse the trial court judgment assessing each party with one half of the costs of this litigation and render judgment assessing Bradley Griffith with all costs both at the trial level and on appeal; and we modify the visitation schedule previously rendered by the trial court to comport with the judgment of this court.

**REVERSED AND RENDERED.**

NUMBER 09-0824

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

BRADLEY GRIFFITH

VERSUS

RESA LATIOLAIS

AMY, J., dissents and assigns reasons.

The majority reverses the trial court's award of joint custody and imposes sole custody in favor of Resa. I respectfully dissent as I find an affirmation is appropriate.

First, I think it is important to note that Bradley instituted this matter, seeking sole custody and, alternatively, joint custody. In her answer and reconventional demand, Resa sought only joint custody and child support. She did not amend the pleadings to request sole custody. In my opinion, this fact is significant in reviewing the trial court's award of joint custody.

Further, I point out that it was not Bradley's burden to demonstrate that joint custody was in the best interest of the child. Rather, the trial court was making an initial determination of child custody pursuant to La.Civ.Code art. 132, which provides:

> If the parents agree who is to have custody, the court shall award custody in accordance with their agreement unless the best interest of the child requires a different award.
>
> In the absence of agreement, or if the agreement is not in the best interest of the child; *the court shall award custody to the parents jointly; however, if custody in one parent is shown by clear and convincing evidence to serve the best interest of the child, the court shall award custody to the parent.*

(Emphasis added.) Thus, Article 132 establishes a presumption for joint custody of the child. Even if Resa had amended her demand to seek sole custody, she would have been required to prove, by clear and convincing evidence, that sole custody in

her favor was in the child's best interest. On review, I find that the record supports the trial court's award of joint custody.

In its reassessment of the custody determinations, the majority discusses unflattering evidence regarding the parties' conduct, particularly that of Bradley. I certainly do not discount this behavior. Yet, the trial court was well aware of this behavior and devoted much of the sixteen pages of its reasons for ruling to related discussion. I do not find any of these extensive factual determinations and credibility assessments by the trial court inconsistent with either the record or the law. Instead, the trial court demonstrated an awareness of the parties' circumstances and tailored its decision accordingly. Concluding that these determinations were within the trial court's province, I would not disturb them on review.

Nor would I disturb the trial court's decision to not designate a domiciliary parent. While Resa complains of this determination, La.R.S. 9:335(B)(I) provides that "[i]n a decree of joint custody the court shall designate a domiciliary parent *except when there is an implementation order to the contrary or for other good cause shown*." (Emphasis added.) The trial court pointed out that both parents have deficiencies and that both have necessary improvements to make. Therefore, the designation of a domiciliary parent was declined. Again, I would not second-guess the trial court's appreciation of the circumstances in this regard.

Finally, the majority further reverses the trial court's determinations regarding continued counseling for the parties and a specific limitation on corporal punishment. Considering the circumstances of this case and the fact that these were fully considered issues at trial, I would not disturb the lower court's judgment which was reached after a full trial on the merits.

For these reasons, I find that an affirmation in full is warranted.

2

**BRADLEY GRIFFITH**

**VERSUS**

**RESA LATIOLAIS**

**Chatelain, Judge Pro Tempore, concurring.**

I agree with the results of the majority opinion. However, I concur to further elaborate on two aspects of this case: the award of sole custody and the discussion of corporal punishment.

Generally, in civil cases, a party who has the burden of proof must prove the fact in issue by a preponderance of the evidence and "not by some artificially created greater standard." *Lasha v. Olin Corp.*, 625 So.2d 1002, 1005 (La.1993); *Jordan v. Travelers Ins. Co.*, 257 La. 995, 1008, 245 So.2d 151, 155 (1971); 2 MCCORMICK ON EVIDENCE § 339, at 421 (5th ed. 1999). Only in exceptional controversies is the clear and convincing standard applied in civil cases "where there is thought to be special danger of deception, or where the court considers that the particular type of claim should be disfavored on policy grounds." *Succession of Lyons*, 452 So.2d 1161, 1165 (La.1984) (quoting MCCORMICK ON EVIDENCE § 340(b), p. 798 (2d ed. 1972)). "The clear and convincing standard requires a party to prove the existence of a contested fact is highly probable, or much more probable than its non-existence. MCCORMICK [ON EVIDENCE § 339, at 421 (5th ed. 1999)]; *Succession of Lyons*, 452 So.2d at 1165." *Talbot v. Talbot*, 03-814, pp. 9-10 (La. 12/12/03), 864 So.2d 590, 598.

Against that background, the Legislature provided in La.Civ.Code art. 132 that "if custody in one parent is shown by clear and convincing evidence to serve the best

interest of the child, the court *shall* award custody to that parent." (Emphasis added). Even though there is a rebuttable presumption that joint custody is in the best interest of the child, a requisite element in any joint custody arrangement is that the spouses be able to set aside their differences and cooperate to carry out a joint custody plan. *See Turner v. Turner*, 455 So.2d 1374 (La.1984). In its thorough examination of the best interest of this child, the majority opinion exposes a record replete with facts which establish clear and convincing evidence that a joint custody plan would not be workable and that the award of sole custody to Resa is mandated.

I also write separately to elaborate and underscore that although Louisiana permits a parent to use corporal punishment to discipline a child, it must be done in a reasonable manner. *See* La.Civ.Code art. 218; La.R.S. 14:18(4). In *Mason v. Hadnot*, 08-2015 (La.App. 1 Cir. 2/13/09), 6 So.3d 256, the case relied upon in the majority opinion, a mother was found not to be in contempt of court for denying scheduled visitation to the father. The basis for that finding was that the father spanked his twelve-year-old daughter ten to fifteen times with a belt because she lied to him about having her cell phone with her during their three previous visitations.[1]

In stark contrast to those facts, the trial court in the present case found no merit to Bradley's contention that "Resa and her father physically abused Cole by spanking

---

[1]Moreover, as described in *Mason*, 6 So.3d at 259-60:

> According to [the mother], [the minor child] stated, "It happened, Mommy." [The minor child] continued, "He beat me like he said he would." [The minor child] explained that during the drive to Houston the previous night, her father had told her what was going to happen and asked her if she was scared. [The minor child] told her mother that she was anticipating it the entire drive, but that nothing happened that night when they arrived at her father's home. Rather, she described being awakened the following morning by her father whipping her with a belt. [The minor child] stated that "it was hurting" and that she "kept asking him to stop."

Cole approximately eleven months before he filed suit." At best, the trial court found Bradley was able to produce evidence that, "on occasion, Resa used corporal punishment on Cole that left small bruises." *Griffith v. Latiolais*, 09-824, p. 28 (La.App. 3 Cir. __/__/10), __ So.3d __, __.

When I compare the nebulous nature of the alleged corporal punishment in the present case to that proven in *Mason*, it is clear that the trial court did not have to reach the issue of whether it was necessary to prohibit corporal punishment. Clearly, the majority properly reverses that portion of the trial court judgment.