VICTORY, J *
bWe granted this writ application to determine whether the court of appeal erred in reversing a trial court judgment which awarded joint custody to both parents with no domiciliary parent, and in granting sole custody to the mother. After considering the record and the applicable law, we reverse the judgment of the court of appeal and reinstate the trial court judgment awarding joint custody; however, we reverse the trial court judgment to the extent it failed to designate a domiciliary *1060 parent and designate the mother as the domiciliary parent.
FACTS AND PROCEDURAL HISTORY
In this highly acrimonious custody battle, Bradley Griffith (“Brad”) filed suit in October, 2005 against Resa Latiolais (“Resa”), the mother of his son, Cole Griffith (“Cole”), seeking sole custody of Cole. Cole was born on November 19, 2001 and lived with Resa from that time until the commencement of this litigation. Brad and Resa were not married. Brad visited Cole freely at Resa’s home during this time, but Resa was his sole caretaker. Resa also has a daughter from a prior marriage, Lana Latiolais, who was 16 at the commencement of the litigation.
|Jn September of 2005, Resa, Cole, Lana, and Greg Chappell, Resa’s new boyfriend, evacuated together to escape Hurricane Rita. When they returned, Brad picked up Cole, who evidently told Brad that he, Resa, and Greg slept in the same bed during the evacuation and that Greg was hurting Resa. From this Brad inferred that Resa and Greg had sexual relations in Cole’s presence. On October 5, 2005, Brad filed a petition seeking sole custody of Cole, alleging Resa had “lately not made choices which are in the child’s best interest and has been hurtful to the child.” Resa answered the petition denying the allegations. Further, she sought joint custody and to be named the domiciliary parent.
Later in October of 2005, Lana left her mother’s home and went to the home of a friend where she reported that she had previously been struck in the mouth by her mother and that on October 26, 2006, her mother struck her in the back. She also reported that her mother had whipped Cole with a wooden spoon as a means of discipline. Lana subsequently recanted these allegations and the Office of Child Services investigated these claims and found no child abuse had occurred. Although Brad filed no subsequent pleadings asserting any other grounds for sole custody, he later asserted that his reasons were that Resa had sexual relations with Greg in Cole’s presence during the evacuation, that Resa and her father spanked Cole during Cole’s third birthday party, and that Resa was abusive to Cole and Lana.
On November 28, 2005, the trial court signed an “Order for Mental Health Evaluation” appointing Dr. Lyle LeCorgne, Ph. D., to perform a custody evaluation of the parents and Cole, as well as Lana, Greg Chapell, and Cindy Hebert, the mother of Brad’s 15-year-old daughter, Paige. Dr. LeCorgne issued a written report containing his findings and recommendations on April 27, 2006, in which he made the following recommendations:
|31. On the basis of the present assessments, it is the opinion of this examiner that the best interests of Cole Griffith are served by Brad Griffith being declared the domiciliary parent and Cole living- primarily with his father. Resa Latiolais shall be granted reasonable visitation consisting of alternating weekends, with a condition of supervision, and no overnight visits until such time that Resa Latiolais has engaged in individual psychotherapy with a qualified mental health professional. Upon the recommendation of that qualified mental health professional the condition of supervision is subject to be removed and the visitation gradually increased to include alternating weekends from Thursday through Monday mornings. It is also recommended that Cole Griffith and Lana Latiolais be referred for individual psychotherapy to assist each of them in reconciling their respective emotional distress.
*1061 2. Once the condition of supervision has been removed, summer visitation shall be divided equally between the parents, with Cole spending alternating weeks with each parent. Major holidays and vacations during the school year shall be alternated and evenly distributed according to a schedule that is mutually agreeable to the parties.
3. All of the parties in this matter shall facilitate, encourage, and support the child’s natural loyalty to the other parent. No adult in this matter shall make any critical, denigrating, or derogatory comments about any of the other adults to Cole or in his presence.
4. Each of the parties shall enroll in and complete the Children Cope with Divorce classes sponsored by the Family Tree Parenting Center in Lafayette, Louisiana, if they have not already done so.
5. Each of the parties shall enroll in and complete the Cooperative parenting classes sponsored by the Family Tree Parenting Center in Lafayette, Louisiana, if they have not already done so. Resa Latiolais shall also enroll in and complete a course in anger management in a program deemed acceptable to the Court.
On May 1, 2006, the trial court appointed Dr. Kenneth Bouillion to counsel the minor child, and ordered that Resa undergo individual counseling, which she began with Margot Hasha, LCSW, BCD. The trial court also ordered that Resa’s custodial periods be supervised until Dr. LeC-orgne was satisfied that she had progressed sufficiently in individual therapy to lift the supervision. The parties stipulated that Brad would participate in a psychological evaluation to be performed on the parties and the minor child by a mental health professions of Resa’s choosing. This Levaluation was performed by Drs. Owen Scott, Ph.D. and Mary Lou Kelley, Ph.D. Drs. Scott and Kelley issued a report on August 17, 2006, recommending the following:
1. That Cole alternate weeks between his mother and his father’s homes from Friday to Friday. Also, we recommend that he spend four hours to one day during the week with the alternate parent and split or alternate holidays with each parent.
2. That Ms. Latiolais be the domiciliary parent and decision maker regarding schooling and medical concerns. She has a long history of being the primary caretaker who made these decisions and her therapist views her as a competent parent. However, Ms. Latiolais and Mr. Griffith should discuss and attempt to reach a decision in all significant matters involving Colé.
3. That Cole continue to attend Ms. Shannon’s preschool given his positive adjustment to the environment. Also, that Cole attend the preschool every regular school day irrespective of the parent with whom he resides.
4. That Cole’s parents meet monthly with Dr. Bouillion, Cole’s therapist to discuss parenting issues.
5. That Cole’s parents refrain from saying negative things about one another. In particular, we recommend that Mr. Griffith stop perpetuating accusations of Ms. Latiolais as a “batterer” or abuser. All concerns should be discussed with Ms. Latiolais present in meetings with Dr. Bouillion.
At trial, the above experts testified regarding their findings and recommendations, as did numerous fact witnesses attesting to various faults, misdeeds, and attributes of the parties. As for the experts, Dr. LeCorgne testified consistent with his report that Brad should be named the domiciliary parent with the goal being *1062 shared custody, while Drs. Kelley and Scott testified that Resa should be the domiciliary parent. Dr. Scott explained their reasoning for this as follows:
Well, we felt like that because of Brad’s lack of belief in her, that it was going to be difficult for them to work together, and that his attitude towards her was more negative than her attitude towards him. And we felt like she would be better able to factor in Brad being involved as a father than he would be able to factor in Resa being involved as a mother. We felt like she would be more likely to make | r,decisions that would be balanced in that regard that would not try to exclude him.
Dr. LeCorgne testified he lifted the condition of supervised visitation in August of 2006. Dr. Bouillion testified as to the progress made by the parents, and testified while he thought Dr. LeCorgne’s recommendation was -reasonable, he was not going to make a recommendation about custody because he was Cole’s therapist. He gave his opinion that both parents needed to continue co-parenting classes, that both were making good progress, and that both needed to continue to see him until the conflicts were resolved. Margot Hasha testified that on May 10, 2006, she wrote a letter to Dr. LeCorgne recommending that Resa be allowed unsupervised visitation based on the progress she was making in individual therapy. She testified that while Resa admitted to her that she hit Cole with a wooden spoon and had “struck Lana,” she did not think Resa had an anger problem or was abusive to her children. Hasha testified that Resa had complied with everything the court had ordered, including 6 weeks of co-parenting classes, and 8 weeks of anger management classes, and that she had no concerns about her ability to be a safe and effective parent. She recommended that Resa continue to see her once a month and that she continue co-parenting with Dr. Bouillion.
The trial court described its findings about Brad’s behavior as follows:
The Court finds that the reason Brad instituted this instant action is because he was upset over the relationship between Resa and Mr. Chappell. Brad clearly desired to control Resa and her relationship with Mr. Chappell. Throughout this twelve (12) day trial, the Court observed Mr. Griffith to be calm and collected, never becoming angry or upset. The testimony of Lafayette Parish Sheriffs Deputy Ronald Ro-bicheaux was very telling. On October 28, 2005, Deputy Robicheaux received a “keep the peace” call to supervise an exchange of Cole between Resa and Brad. In his testimony, Deputy Robi-chaux indicated that Brad was “pretty irate” because Resa had another man with her. He described Brad as screaming, hollering, and aggressive, though not in a physical way, as well as being upset and irrational. Although Brad claimed that this was because Mr. Chappell was videotaping the exchange, Deputy |fiRobichaux testified that he never saw a camera in Mr. Chappell’s possession.
[[Image here]]
While the Court finds the parties are fairly even on the remaining factors, they have both fallen woefully short in encouraging a close and continuing relationship between the minor child and the other parent. Though Brad has claimed to want a good working relationship with Resa, and even paid for co-parenting therapy, he has engaged in an intentional pattern of conduct designed to place her under severe stress and destabilize her life. Also, Brad has appeared to follow this Court’s suggestions through *1063 out this litigation while surreptitiously setting his own agenda. Further, Brad has shown a propensity to manipulate people, especially females, to fulfill his agenda of winning custody, while at the same time crushing Resa psychologically, financially, and criminally.
At the conclusion of a hearing in this matter on January 19, 2006, this Court strongly suggested to Brad that he distance himself from Jan Huffman, and her daughter, Jessica Harbin. Both of these women had overly involved themselves in this situation by encouraging Lana to turn against her mother [in reporting abuse by Resa] and supporting Brad’s quest for sole custody. The Court stated:
I really think you need to be careful about Ms. Huffman. Make it very clear to her that she needs to, please, stay out of your business; you will stay our of hers.
In discussing Ms. Huffman and her daughter, the Court stated:
I don’t know if they are troublemakers, or she saw something that she thought she saw, or what the deal is. But again, I don’t think I would put a lot of stock in what Ms. Huffman and her daughter had to say about the situation from here on out, Mr. Griffith. You need to set some boundaries with them. There is a little too much going on with them.
After reviewing the massive numbers of telephone communications and hours of telephone calls between Brad and Jan Huffman, and Brad and Jessica Harbin, as well as the timing of these calls, the Court has no doubt that Brad not only ignored this Court’s strong suggestion, but actually used these women to attempt to get Resa in criminal trouble and cause her stress and anxiety as a tactic to win custody of Cole. Brad’s testimony that these many hours of phone calls were to discuss politics in St. Landry Parish and matters other than this custody litigation is simply not credible. Jan Huffman and Jessica Harbin have harassed Resa with false criminal charges of stalking and a false allegation that Resa tried to run Jessica Harbin over with her van. 17These complaints resulted in police officers being dispatched to Resa’s home while Cole was in her care. Also, the Court finds by a preponderance of the evidence that Brad encouraged Jan Huffman and Jessica Harbin to stalk Resa, and encouraged Jessica Harbin to make harassing telephone calls to her for which Ms. Harbin was criminally charged.
[[Image here]]
Also, this Court made it clear to both parties, after consulting with Dr. LeC-orgne and Dr. Bouillion that the child should remain at Learning Express Daycare and should attend three (3) days per week instead of two (2) days per week. Again, Brad ignored this Court’s directive and sabotaged the situation by involving a private investigator, Robert Williamson, who appeared at the daycare with him on several occasions and who made inquiries concerning the owners of the daycare to Karl Breaux at Breaux’s Minute Mart. This resulted in the child being dismissed from the daycare center by the owners, Bernadette and Dale Roberts. At the recommendation of Dr. Bouillion, the child was then placed in Ms. Shannon’s Daycare and did very well there. Though the change in daycares may have actually benefitted the child, this does not excuse Brad’s behavior in ignoring both the recommendations of Dr. LeCorgne and Dr. Bouil-lion, as well as the directive of the Court, in order to carry out his own agenda believing the Roberts were *1064 somehow favorable to Resa. Yet another adjustment Cole had to endure.
The Court is also concerned about Brad’s efforts to turn Lana against her mother in the course of this litigation. Again, he used the help of his cohorts, Jan Huffman and Jessica Harbin, to accomplish his mission. The Court finds it wholly inappropriate to have involved Lana Latiolais in this custody dispute by attempting to drive a wedge between her and her mother. The Court views this behavior as further evidence of Brad’s pattern of manipulating women.
The Court also notes that Brad attempted to pressure Juvenile Officer Alex Montgomery, III, to make a finding of child abuse against Resa. The Court finds that Brad went so far as to have then State Senator Donald Cravins contact Officer Montgomery in an effort to obtain the result he wanted — a finding that Resa had physically abused Lana and Cole.
Though Brad was initially invited to join First Baptist Church by Mike Pla-sek, the Court finds that Brad was well aware that Resa had already been attending that church. However, he chose to become a member, in part, to garner favor with this Court and to sully Resa’s reputation. Once he joined the church, Brad set about to ingratiate himself with the pastor, Perry Sanders, by personally handing him donations comprised of cash and checks. Also, Brad wore a yellow bracelet to church which he explained to church members was a demonstration of support for victims of child abuse, which included |sCole at the hands of Resa. Brad chose to sit in close proximity to Resa in the church sanctuary to place pressure on her during the church services, eventually resulting her leaving the church and joining another local Baptist church. The Court also finds the statement made by the mother of Brad’s other child, Cindy Hebert, in a telephone conversation with attorney Julie Vaughn Felder which occurred on August 15, 2006 to be credible. In that conversation, Ms. Hebert indicated that the reason Brad became involved with First Baptist Church and Reverend Perry Sanders was he believed that this Court would be “crazy” to go against a minister of a church of 10,000 people in this community.
[[Image here]]
The Court also finds that the incident that occurred between Resa and Cindy Hebert at Opelousas General Hospital on November 30, 2005, was orchestrated by Brad. It is clear from the cell phone records that Brad spoke to Officer Roy-lis Brent Gallow of the Opelousas Police Department prior to appearing at the hospital. Brad admitted knowing Officer Gallow previously, though he denied speaking to him that day. Again, the Court finds that Brad’s testimony in this regard, as well as the testimony of Officer Gallow, is not credible. That morning Brad was bringing the minor child to Opelousas General Hospital for some lab tests associated with a urinary tract infection and was to meet Resa at the hospital. Because of their past acrimony, the Court believes Brad was confident that if he brought Cindy Hebert with him, that Resa would become upset and lose control. Further, he wanted to document Resa’s conduct by having Officer Gallow present as a witness. Again, this was a manipulation by Brad to bait Resa into acting inappropriately in a public place and to document her actions. Sadly, Resa predictably took the bait and actually battered Cindy Hebert in the process by shoving her with her elbows as Resa held Cole in her arms. Again, all of this occurred in the presence of the minor child, and was yet *1065 another traumatic experience for him involving parental conflict and police officers.[1]
After considering the experts’ testimony, the testimony relating Brad’s behavior during the proceedings, and other testimony, the trial court finally rendered a final judgment granting Resa and Brad joint custody of Cole, with neither parent designated as the domiciliary parent. Custody was evenly shared and detailed in a document attached to the judgment. Brad and Resa were ordered to continue co-parenting sessions with Dr. Bouillion, and Greg Chappell was ordered to join them, and they were ordered to follow his recommendations with regard to co-parenting 19Cole. Brad was ordered to begin counseling with Dr. Lynn Aurich, Ph.D. and Resa was ordered to continue counseling with Mar-got Hasha. It was further ordered that neither party engage in any form of corporal punishment of Cole. In its Reasons for Judgment, the trial court explained that, in spite of Brad’s behavior, it was awarding the parties joint custody with no domiciliary parent because it was also concerned with some of Resa’s issues. Namely, the trial court found Resa has a “problem with dependency on men,” and that, she committed food stamp and medical benefit fraud in an attempt to become financially independent from Brad.[2] Further, the trial court found that while Resa was pursuing her education,[3] she did this “at the expense of her children” and “her ability to manage and care for the children was severely diminished, resulting in inappropriate discipline.” The trial court also found that while Resa’s use of a wooden spoon to discipline Cole “did not rise to the level of child abuse, ... [it] constitute^] excessive and inappropriate discipline.” The trial court found fault with her relationship with Greg Chappell and her approach to counseling. However, the court found both parties had made a lot of progress with the help of Dr. Bouillion, there was less conflict between them, and Cole was progressing very well. . The court found “good cause exists not to name a domiciliary | mparent”[4] as “[b]oth parents have defi *1066 ciencies, and while they have shown improvement, there is still work to be done.”
Although suit was filed in October 2005, the trial court did not issue its final judgment until October 9, 2008. This three year delay was caused by six preliminary hearings which delayed the trial on the merits until August 21, 2006, thirteen days of testimony spanning from August 21, 2006 to January 28, 2008, two months of having the case under advisement, and five more months for the trial court to execute a judgment incorporating its reasons for judgment into the final judgment.[5]
InThe court of appeal reversed, and awarded Resa sole custody of Cole, even though she never asked for sole custody in her pleadings. Griffith v. Latiolais, 09-0824 (La.App. 3 Cir. 3/3/10), 32 So.3d 380. The court of appeal faulted the trial court for looking beyond Brad’s allegations for seeking custody, i.e., that Resa had engaged in sexual relations with Greg Chap-pell in Cole’s presence during the evacuation and that Resa had physically abused Cole, both of which the trial court found were not proven. When those allegations are set aside, the court of appeal found the balancing factors found in La. C.C. art. 134 clearly fell in Resa’s favor. Griffith, 32 So.3d at 389. Further, the court of appeal found subsequent events during the course of the trial “improperly expanded the issues and impacted the ultimate result.” Id. at 390. The court of appeal then summarized the trial court’s lengthy analysis of Brad’s bad behavior and scant findings of any bad behavior on the part of Resa. Id. at 390-92. Accordingly, the court of appeal found no manifest error in the trial court’s factual findings, but found error in its “equal balancing of Resa’s actions against Bradley’s transgressions.” Id. at 392. Particularly, the court of appeal stated:
In summary, the trial court found factually that Bradley is devious, manipulative, and retaliatory, and that these base characteristics particularly come to the surface in his dealings with women; that he had little or no involvement in Cole’s life prior to filing this suit; that not only was the initial suit without merit, but Bradley’s motivation for filing suit was not Cole’s best interest, but jealously; and that Bradley was engaged in a continuing campaign to discredit Resa and influence the trial court decision without regard to the dishonesty of his tactics or the falsity of his assertions. On the other hand, the trial court found that Resa bore the singular responsibility for raising Cole from his birth until after this litigation began; that during that time, she allowed and encouraged *1067 Bradley’s involvement in Cole’s life; that she began an attempt to better educate herself to become more independent of her manipulative former lover and to better care for her son; and that her | ^retaliatory actions between the filing of suit and judgment were directly in response to Bradley’s antics.
Id. at 393-94. The court of appeal found that the trial court erred in awarding Brad an “equal-sharing custody arrangement-a judgment that is inconsistent when compared to the factual findings.” Id. at 394.
The court of appeal found that the evidence was clear and convincing that sole custody be awarded to Resa and faulted the trial court for using Dr. Bouillion to regulate Brad’s behavior and substituting resolution of the parents’ problems for Cole’s best interest. Id. at 396, 398. The court of appeal found that although Resa did not ask for sole custody in her initial pleading, “the ‘best interest’ requirement of La. Civ.Code art. 132 mandated an award of sole custody.” Id. at 394, n. 18. Finally, the court of appeal found the trial court erred in “mandating] that the parties delegate their right to make parental decisions to mental health care professionals on a continuing basis.” Id. at 397. It found this to be error because the statutes limit the involvement of expert testimony to assisting the trial of fact as allowed by La. C.E. art. 702 and continued professional involvement is only allowed by La. R.S. 9:358.1 whereby a parenting coordinator may be appointed to assist the parties in resolving disputes but only “if the court has previously entered a judgment establishing child custody, other than an ex parte order.” Id. at 397-98. The court noted that the comments to La. R.S. 9:358.1 indicate the “purpose of this limitation is to prevent the court from using the parenting coordinator process as a means of abdicating its responsibility to make the initial custody determination,” which it found the trial court had done in this case. Id. at 398. Further, the court of appeal reversed the portion of the judgment prohibiting corporal punishment and assessed all costs against Brad. Id. at 398-99. Finally, Brad was granted visitation as follows: the first and third weekends of each month from 6:00 p.m. on Friday until 8:00 p.m, 11son Sunday of each weekend; equally shared holiday visitation as provided by the trial court; and three weeks summer visitation beginning at 6:00 p.m. on the first Friday of July and ending at 6:00 p.m. on the third Sunday of July. Id. at 399-400.
We granted Brad’s writ application to determine whether the court of appeal erred in granting Resa sole custody of Cole, especially where she did not ask for sole custody in her pleadings. Griffith v. Latiolais, 10-754 (La.4/30/10), 34 So.3d 295.
DISCUSSION
The following Civil Code provisions govern child custody awards. La. C.C. art. 131 provides “[i]n a proceeding for divorce or thereafter, the court shall award custody of a child in accordance with the best interest of the child.” La. C.C. art. 132 provides:
If the parents agree who is to have custody, the court shall award custody in accordance with their agreement unless the best interest of the child requires a different award.
In the absence of agreement, or if the agreement is not in the best interest of the child, the court shall award custody to the parents jointly; however, if custody in one parent is shown by clear and convincing evidence to serve the best interest of the child, the court shall award custody to that parent.
*1068 The burden on the parent seeking sole custody is to demonstrate that the granting of custody to that parent alone will be in the best interest of the child. Kenneth Rigby, 1993 Custody and Child Support Legislation, 55 La. L.Rev. 103, 110 (1994). In determining the best interest of the child, La. C.C. art. 134 provides:
The court shall consider all relevant factors in determining the best interest of the child. Such factors may include:
(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
114(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.
Provisions of the Civil Code Ancillaries regulate joint custody decrees and the appointment of a domiciliary parent. La. R.S. 9:335 provides:
A.(l) In a proceeding in which joint custody is decreed, the court shall render a joint custody implementation order except for good cause shown.
(2) (a) The implementation order shall allocate the time periods during which each parent shall have physical custody of the child so that the child is assured of frequent and continuing contact with both parents.
(b) To the extent it is feasible and in the best interest of the child, physical custody of the children should be shared equally.
B.(l) In a decree of joint custody the court shall designate a domiciliary parent except when there is an implementation order to the contrary or for other good cause shown.
(2) The domiciliary parent is the parent with whom the child shall primarily reside, but the other parent shall have physical custody during Intime periods that assure that the child has frequent and continuing contact with both parents.
(3) The domiciliary parent shall have authority to make all decisions affecting the child unless an implementation order provides otherwise. All major decisions made by the domiciliary parent concerning the child shall be subject to review by the court upon motion of the other parent. It shall be presumed that all major decisions made by the domiciliary parent are in the best interest of the child.
*1069 C. If a domiciliary parent is not designated in the joint custody decree and an implementation order does not provide otherwise, joint custody confers upon the parents the same rights and responsibilities as are conferred on them by the provisions of Title VII of Book I of the Civil Code.[6]
La. R.S. 9:336 provides that “[jjoint custody obligates the parents to exchange information concerning the health, education, and welfare of the child and to confer with one another in exercising decision-making authority.” Non-major decisions are not subject to judicial review. Evans v. Lungrin, 97-541 (La.2/6/98), 708 So.2d 731, 738. One commentator has described the authority of the domiciliary parent as follows:
[La. R.S. 9:335] provides that the domiciliary parent has the authority to make all decisions affecting the child unless an implementation order otherwise provides. Thus, a non-domiciliary parent who does not desire the domiciliary parent to have full decision-making authority must have any restrictions on that authority incorporated into the implementation order. All major decisions made by the domiciliary parent concerning the child are subject to judicial review upon motion by the non-domiciliary parent. In this judicial review, it is presumed all major decisions made by the domiciliary parent are in the best interest of the child. Therefore, the burden of proving they are in fact not in the best interest of the child is placed on the non-domiciliary parent who opposes the decisions. Non-major decisions are not subject to judicial review. Thus, the act strengthens the position of the domiciliary parent and permits him to make all of the decisions concerning the child, unless limited by the implementation order, with only major decisions being subject to judicial review. Although the act does not define the nature of a major decision, such decisions normally include decisions concerning major surgery or medical treatment, elective surgery, and | ^schools attended, but not the day-today decisions involved in rearing a child, e.g., bedtimes, curfews, household chores, and the like. The increase in the burden of proof, the shift in the focus of the inquiry, and the changes made in the decision-making rules combine to strengthen the joint custody preference. The changes in the decision-making rules make parental cooperation less critical to a successful joint custody award. Therefore, courts should be more reluctant to abandon joint custody as a preferred custodial arrangement because one or both parents are refusing to cooperate in the rearing of the child.
Rigby, supra at 113.
Finally, relevant to this case, La. R.S. 9:358.1 provides for the appointment of a parenting coordinator, as follows:
A. On motion of a party or on its own motion, the court may appoint a parenting coordinator in a child custody case for good cause shown if the court has previously entered a judgment establishing child custody, other than an ex parte order. The court shall make the appointment on joint motion of the parties.
B. The initial term of the appointment of the parenting coordinator shall not exceed one year. For good cause *1070 shown, the court may extend the appointment of the parenting coordinator for additional one year terms.
C. The court shall order each party to pay a portion of the costs of the parenting coordinator. No parenting coordinator shall be appointed by the court if a party has been granted pauper status or is unable to pay his apportioned cost of the parenting coordinator.
The comments to this statutory provision describe the appointment of a parenting coordinator as follows:
Parenting coordination is a child-focused alternate dispute resolution process in which a duly qualified parenting coordinator assists parents ... to implement a parenting plan by facilitating the resolution of their disputes in a timely manner and by reducing their child-related conflict so that the children may be protected from the impact of that conflict. The parenting coordinator assists the parties in promoting the best interests of the children by reducing or eliminating child-related conflict through the use of the parenting coordination process.
La. R.S. 9:358.1, Official Revision Comments-2007. “Good cause” to appoint a parenting coordinator “includes a determination by the court that either or both parties 117have demonstrated an inability or unwillingness to collaboratively make parenting decisions without assistance of others or insistence of the court,” and may also include “an inability or unwillingness to comply with parenting agreements and orders or a determination by the court that either or both parties have demonstrated an ongoing pattern of unnecessary litigation, refusal to communicate or difficulty in communicating about and cooperation in the care of the children, and refusal to acknowledge the right of each party to have and maintain a continuing relationship with the children.” Id.
Brad asserts the court of appeal erred in overturning the trial court’s award of joint custody as it was not manifestly erroneous, and erred in awarding Resa sole custody when she did not ask for sole custody in her pleadings. Further, Brad asserts the court of appeal erred in reversing the trial court’s orders that the parties continue co-parenting with Dr. Bouillion, refrain from corporal punishment, and that costs be assessed equally between the parties.
A trial court’s factual findings may only be overturned if manifestly erroneous. Pursuant to the 1993 Revisions to the child custody provisions, joint custody is no longer presumed to be in the best interest of the child; however, it is mandated unless (1) there is an agreement between the parents to the contrary which is in the best interest of the child, or (2) one parent shows by clear and convincing evidence that sole custody to that parent would serve the best interest of the child. La. C.C. art. 132. “Clear and convincing” evidence is applied in civil cases only in exceptional circumstances, “where there is thought to be special danger of deception, or where the court considers that the particular type of claim should be disfavored on policy grounds.” Talbot v. Talbot, 03-814 (La.12/12/03), 864 So.2d 590, 598 (citing Succession of Lyons, 452 So.2d 1161, 1165 (La.1984) and McCormick on 11REvidence, § 340(b), p. 798 (2d ed.1972)). “The clear and convincing standard requires a party to prove the existence of a contested fact is highly probable, or much more probable than its non-existence.” Id.
In this case, no expert, including the experts charged with doing custody evaluations, testified that the best interest of the child would be served by awarding Resa sole custody. In fact, every expert testified that custody should be shared. *1071 Further, although Brad’s moral fitness is certainly questionable, La. C.C. art. 131 was revised in 1993 to provide that the moral fitness of the parents is now a factor to be considered only insofar as it affects the welfare of the child. This “reflects the jurisprudential rule that moral misconduct should be considered only if it has a detrimental effect on the child, not to regulate the moral behavior of the parents.” Rig-by, supra at 114. Dr. Scott did testify that if Brad really committed some of the acts Resa claimed, which the trial court eventually found he committed, that would show “disregard for the child’s interest and sociopathic qualities that are predictive of bad things and themselves harmful ...” However, no expert testified he was a sociopath. The testimony was un-controverted that Brad and Cole had strong emotional ties to each other, and that Brad was a competent father capable of providing Cole with all his needs. Further, Brad’s actions are only relevant to the best interest factors set out in La. C.C. arts. 134(6) and (10), and trial testimony indicated he was progressing in these areas. We agree that some of Brad’s behavior could have had a detrimental effect on the child, but it appears the court of appeal awarded sole custody to Resa based mostly on Brad’s behavior towards her, without sufficiently considering the other best interest factors listed in La. C.C. art. 134.
Here, not only did Resa not ask for sole custody in her pleadings, she did not prove by clear and convincing evidence that sole custody is in Cole’s best interest. 119While an appellate court “shall render any judgment which is just, legal, and proper upon the record on appeal,” La. C.C.P. art. 2164, its judgment of sole custody was not supported by the record. Thus, we reverse the court of appeal’s award of sole custody to Resa and find the trial court’s grant of joint custody was not manifestly erroneous.
In conjunction with its award of sole custody, the court of appeal reversed the trial court’s order that the parties continue co-parenting counseling sessions with Dr. Bouillion, and that they follow his recommendations regarding co-parenting. There is no provision in the law that allows the trial court to require continued counseling outside the parameters of La. R.S. 9:358.1. That statute allows the trial court on its own motion to appoint a “parenting coordinator” after it has entered a judgment establishing child custody for good cause shown. The initial term cannot exceed one year, although the one year term may be extended for good cause shown. Here, the trial court did not appoint a parenting coordinator pursuant to the provisions of this statute. It initially ordered that the parents see Dr. Bouillion for co-parenting help before it issued a judgment establishing custody and the parents saw him for two years. Then, after it issued its final judgment establishing custody, it ordered the parents, and Greg Chappell, to continue seeing him and to defer to his parenting decisions for an indefinite period. By the time the court of appeal reversed the trial court’s judgment, the parents had been co-parenting with Dr. Bouillion for several years. Further, they have been ordered to pay for the sessions, and Resa does not seem to have the finances for this extensive amount of counseling. Financial hardship is taken into account in La. R.S. 9:358.1 as the appointment of a parental coordinator is prohibited if one party cannot pay his apportioned cost, which appears to be the situation here. Thus, we find the court of appeal did not err in reversing the trial court’s decision to require the parents and Greg Chappel to continue to see Dr. li>nBouillion and to help them make parenting decisions. Not only did the trial court appoint Dr. Bouillion outside the confines *1072 of La. R.S. 9:358.1, good cause has not been shown sufficient to require a parenting coordinator for this extensive length of time. The record reflects that Resa has never shown an “inability or unwillingness to comply with parenting agreements and orders ... [or] an ongoing pattern of unnecessary litigation, refusal to communicate of difficulty in communicating about and cooperation in the care of [Cole]” or “refusal to acknowledge the right of [Brad] to have and maintain a continuing relationship with [Cole].” See La. R.S. 9:358.1, Official Revision Comments, 2007, supra. The parties are free to see Dr. Bouillion if need be, but we find to require them to do so at this point is unreasonable. Therefore, we affirm the court of appeal’s judgment in this regard.
Further, given that the trial court’s award of joint custody has been reinstated, the domiciliary parent issue must be addressed. La. R.S. 9:335 requires the trial court to appoint a domiciliary parent unless there is an implementation order to the contrary or for other good cause shown. The trial court found “good cause not to name a domiciliary parent” as “[b]oth parents have deficiencies, and while they have shown improvement, there is still work to be done.” We find that at this stage of the case, five years after this custody suit was filed, a domiciliary parent should be designated. While the trial court found good cause because “there is still work to be done,” that is no doubt the case in every child custody case. Further, “the changes in the decision-making rules [relative to domiciliary parents] make parental cooperation less critical to a successful joint custody award.” Rigby, supra at 113. Resa was making all decisions relative to Cole before this suit was filed and the trial testimony indicates she is best suited to taking this role once more. While Dr. LeCorgne recommended that Brad be named the domiciliary parent, we find he did so under the 121initial influence of the abuse charges made by Brad against Resa, and without a clear understanding of the roles of these parents before this suit was filed. For instance, he testified that he was unaware Cole had never spent the night with Brad before this suit was filed. In addition, he was perhaps influenced by phone calls from Brad prior to the issuance of his report. Drs. Scott and Kelley recommended that Resa be named the domiciliary parent and Margot Hasha testified that Resa had the ability to work with Brad for the best interest of the child. Accordingly, based on the evidence in the record, we see no need to remand this matter for the appointment of a domiciliary parent and designate Resa as the domiciliary parent.
In addition, Brad assigns as error the court of appeal’s reversal of the trial court order that “neither party shall engage in any form of corporal punishment of the minor child whatsoever.” In Louisiana, a parent is permitted to use corporal punishment to discipline a child provided it is done in a reasonable manner. See La. C.C. art. 218, La. R.S. 14:18. Although Resa admitted to spanking Cole with a wooden spoon as a form of discipline on a few occasions, she was counseled to use time outs instead and readily agreed. Her individual therapist testified Resa did not have an “anger problem” and she had no concerns that Resa would abuse Cole. There was no evidence that Resa continued to use corporal punishment as a means of discipline as the years progressed. Therefore, it was unnecessary for the trial court to prohibit corporal punishment in this case and we agree with the court of appeal’s ruling in this respect. Certainly, if any party uses corporal punishment in an unreasonable manner, that issue will have to be addressed at that time.
*1073 Finally, Brad assigns as error the court of appeal’s assessment of 100% of the court costs against him and asks that the trial court judgment regarding costs be ^reinstated. Finding no error in the court of appeal’s assessment of costs, we affirm that ruling.
DECREE
For the reasons stated herein, the judgment of the court of appeal is reversed to the extent it granted sole custody of Cole Griffith to Resa Latiolais. The trial court judgment awarding joint custody of Cole Griffith to Resa Latiolais and Bradley Griffith is reinstated. Resa Latiolais is designated as the domiciliary parent. In all other respects, the judgment of the court of appeal is affirmed.
REVERSED IN PART; AFFIRMED IN PART.

 Retired Judge Philip C. Ciaccio, assigned as Justice ad hoc, sitting for Chief Justice Catherine D. Kimball.

. This only describes some of Brad’s behavior.

. There was actually no evidence presented of medical benefit fraud.

. Resa began attending LSU at Eunice, Louisiana in the fall of 2004, progressed in her studies, and was scheduled to receive an Associate of Science degree in Radiologic Technology in May of 2008.

. Throughout the case, the trial court continually warned the parents that he might not name a domiciliary parent. Early on in the case, the trial court told the parties:
... the worst thing I think that could happen to the two of you is that I name someone a domiciliary parent, I come up with a rigid schedule. Your child’s best interests will not be served. And the reason it will not be served is because when the other parent ought to have him, they don’t. So if you are busy, if you’ve got something coming up, the child ought to have the opportunity to be with the other parent. That’s what wouldn't happen under that.
Number two is if I name a domiciliary parent, it's not going to solve the underlying issue of the lack of communication. In fact, in my opinion, it will prevent y'all from getting to that point quicker. And the reason is is that the worst thing I think that can happen in a custody case is somebody thinks they are a winner and somebody thinks they are a loser. Then the balance of power is very skewed. And that gives neither party, neither party the, if you will encouragement to get better because "I’m a winner,” "I’m a loser,” "I’m screwed,” "I’m victorious.” So why would you change the situation? Right now if we name nobody domiciliary parent, then y'all should be falling all over each other to allow the other parent close and continuing contact with the child because if we have to come back and decide a domiciliary parent, that's what I’m going to be looking at. *1066 “A,” have you been acting in good faith and trying to get past these issues that you have? “B,” have you learned how to parent this child? Have you worked as hard as you can to co-parent with the other parent? Have you been willing to allow the other parent to have contact when it serves the child’s best interest? That's the stuff I would be looking at, okay.
At that point, after the parties reached an agreement to set up and attend co-parenting sessions with Dr. Bouillion, the trial court stated that no domiciliary parent would be named yet and the parties would work with Dr. Bouillion to make joint decisions regarding Cole. The court stated that the parties might never need a domiciliary parent if they began working really well together. Throughout the remainder of the proceedings, the trial court stated that he needed to keep Dr. Bouillion involved as the parties needed intensive co-parenting sessions.

. Although the parties asserted at oral argument before this Court that this type of delay in custody suits was "common,” we are concerned about this delay as it is wholly unacceptable. In child custody suits, the best interest of the child cannot be served by such lengthy proceedings. Further, it took another year and a half for the court of appeal to issue its judgment, which is likewise unacceptable.

. Title VII of Book I of the Civil Code contains Articles 184-245. Article 216 provides that although the child would remain under the authority of his father and mother, in the case of differences between the parents, the authority of the father prevails. Rigby, supra at 118, n. 91.