NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

19-257

J.A.D.

VERSUS

K.B.F.

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 20140237
HONORABLE CHARLES G. FITZGERALD, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

ELIZABETH A. PICKETT
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Elizabeth A. Pickett, and Van H. Kyzar, Judges.

AFFIRMED.

**Richard Ducote**
**Attorney at Law**
**318 East Boston St., 2nd Floor**
**Covington, LA 70433**
**(985) 898-2755**
**COUNSEL FOR DEFENDANT-APPELLANT:**
     **KBF**

**Michael V. Matt**
**Attorney at Law**
**P. O. Drawer 191**
**Eunice, LA 70535**
**(337) 457-8260**
**COUNSEL FOR DEFENDANT-APPELLANT:**
    **KBF**

**George R. Knox, L.L.C.**
**Attorney at Law**
**117 W. Convent St.**
**Lafayette, LA 70501**
**(337) 264-9083**
**COUNSEL FOR PLAINTIFF-APPELLEE:**
    **JAD**

**Shane M. Mouton**
**District Attorney's Office-Non-Support Division.**
**P. O. Box 2609**
**Lafayette, LA 70502**
**(337) 235-0751**
**COUNSEL FOR INTERVENOR-APPELLEE:**
    **State of Louisiana**

**PICKETT, Judge.**

The mother of twin daughters filed numerous complaints, alleging that their father sexually abused them. The local police department and a state agency investigated the complaints, and two child abuse centers assisted with some of the investigations. None of the investigations substantiated sexual abuse. The trial court conducted hearings for temporary and permanent custody that spanned more than eleven months and ultimately awarded the father sole custody and the mother visitation rights. The mother appeals. Finding no manifest error in the trial court's awards, we affirm.

**FACTS**

On August 10, 2012, twin daughters (J1 and J2)[1] were born to KF and JD. Before their daughters were born, the parents lived together but had issues in their relationship. After the birth of their daughters, the parents' issues escalated, and they ceased living together. Beginning in June 2013, KF began bringing the children to physicians, asserting that JD was sexually abusing them. Her allegations resulted in nine formal investigations being conducted to determine the validity of the allegations.[2] The investigating agencies did not find sufficient evidence to substantiate the complaints.

From January 2014 until the conclusion of the trial that resulted in the judgment appealed, the parties filed at least ten competing petitions regarding

---

[1] We are not required to use initials to protect and maintain the privacy of the minor children involved in a custody case. *See* Uniform Rules, Courts of Appeal, Rule 5-1 and Rule 5-2. However, we choose to use the initials of the minor children herein due to the nature of the allegations at issue. *See Rodock v. Pommier*, 16-809 (La.App. 3 Cir. 2/1/17), 225 So.3d 512, *writ denied*, 17-631 (La. 5/1/2017), 221 So.3d 70; *Clarke v. Clarke*, 16-669 (La.App. 5 Cir. 4/4/17), 219 So.3d 1228.

[2] The mother and mandatory reporters reported allegations of sexual abuse to the Lafayette Police Department (LPD) and the Louisiana Department of Child and Family Services (DCFS) in March and June 2013; July 2014; and March, July, and November 2016.

alleged abuse, custody, contempt, and visitation. They entered into two consent judgments regarding custody and visitation during that time. The first judgment dated January 27, 2014, granted the parents joint custody on an alternating schedule of two days/two days/three days with neither parent being domiciliary parent and KF's custody being exercised with her mother present. On November 6, 2014, the second consent judgment granted JD custody Monday through Friday and granted KF custody Friday afternoon after the children's school day ended through Monday morning when their new school week began. KF was also given the option of exercising two Wednesday overnight visitations per month. Again, neither parent was designated domiciliary parent. The parties operated under that agreement apparently without conflict until July 2016, when KF refused to return the children to JD in accordance with the consent judgment.

On September 26, 2016, based on KF's allegations of sexual abuse by JD, a hearing officer issued a temporary restraining order (TRO) granting KF custody of the children and prohibiting JD from having contact with them. Thereafter, on October 10, the trial court issued an order maintaining the TRO and KF's custody of the children. On that date, the trial court also appointed clinical child psychologist, Amy Cavanaugh, PhD, to conduct a mental-health/custody evaluation, and authorized JD to resume visitation with the children only as recommended by Dr. Cavanaugh. In a letter to the trial court dated November 2, 2016, Dr. Cavanaugh recommended that: (1) JD resume supervised visitation with the children, so that she could conduct a parent-child interaction assessment; (2) JD's sister be appointed visitation supervisor; (3) the children resume attending

2

school;[3] and (4) the children's counseling sessions cease. The following day, the trial court issued an order formally implementing the recommendations and granted JD supervised visitation with the children beginning November 6, 2016, to be exercised on Sundays and Wednesday evenings.

KF brought the children to the emergency room of a Lafayette hospital on November 11 and to a physician's office on November 14, alleging that they had been sexually abused by JD. After conducting examinations of the children, both physicians reported to DCFS that they suspected the children had been sexually abused by JD. DCFS began investigating the allegations. On November 17, 2016, pursuant to a recommendation by DCFS, a juvenile court issued an order that removed the children from KF's custody and placed them with their paternal aunt, where they remained for approximately two and one-half months. That order also divested the trial court of jurisdiction in family court. In early February 2017, the juvenile proceeding was dismissed after the investigations by the Lafayette Police Department (LPD) and the Louisiana Department of Child and Family Services concluded with the finding that JD had not sexually abused the children. The investigation of the allegations against JD was ongoing from July 14, 2016, until the juvenile proceeding was dismissed.

On February 7, 2017, JD filed an ex parte motion for temporary and sole custody of the children with KF having supervised visitation. That date, the trial court granted JD temporary custody of the children, with his sister serving as a safety monitor, and granted KF supervised visitation with the children. The trial court then conducted a temporary custody hearing over the course of four days,

---

[3] From July 2016 through November 3, Mother had sole custody of the children, and she did not bring them to school regularly. They were four years of age at the time and had been attending the school since they were two years of age.

February 22, and March 6, 8, 10, 2017, after which it issued a temporary custody order granting JD sole custody of the children and KF supervised visitation for designated periods on Saturdays, Sundays, and Tuesday and Thursday evenings. Thereafter, over the course of six days in August, October, and November 2017, the trial court conducted a permanent custody hearing. On November 21, the trial court issued extensive oral reasons for ruling in which it granted sole custody to JD and granted KF regular visitation with the children.

KF filed a motion for expedited appeal and sought approval to proceed as a pauper. Initially, the trial court denied her request to proceed as a pauper. JD then filed a motion to dismiss KF's appeal due to her failure to pay costs. KF filed a writ application with this court to have the trial court's denial of her pauper request reversed, which this court granted. *JD v. KF*, 18-328 (La.App. 3 Cir. 4/25/18) (unpublished writ decision). JD then filed a motion, seeking to traverse KF's authority to proceed as a pauper, which was denied. The appeal record was lodged April 3, 2019.

## ASSIGNMENTS OF ERROR

KF assigns three errors with the trial court's judgment:

1) The trial court clearly erred as a matter of law and manifestly abused its discretion in granting JD sole custody of the two children.

2) The trial court clearly erred and manifestly abused its discretion in using the C.C. art. 134(10) best interest factor as trumping all other art. 134 factors under the particular circumstances of this case, where there was objectively substantial evidence that JD was abusing the children.

3) The trial court clearly erred and manifestly abused its discretion in assessing the court costs and Dr. Cavanaugh's fees against KF.

4

# DISCUSSION

## *Sole Custody*

In *Griffith v. Latiolais*, 10-754 (La. 10/19/10), 48 So.3d 1058, 1070, our supreme court set forth the burden of proof in a proceeding for sole custody:

> A trial court's factual findings may only be overturned if manifestly erroneous. Pursuant to the 1993 Revisions to the child custody provisions, joint custody is no longer presumed to be in the best interest of the child; however, it is mandated unless (1) there is an agreement between the parents to the contrary which is in the best interest of the child, or (2) one parent shows by clear and convincing evidence that sole custody to that parent would serve the best interest of the child. La.C.C. art. 132. . . . "The clear and convincing standard requires a party to prove the existence of a contested fact is highly probable, or much more probable than its non-existence." [*Talbot v. Talbot*, 03-814 (La. 12/12/03), 864 So.2d 590, 598 (citing *Succession of Lyons,* 452 So.2d 1161, 1165 (La.1984) and *McCormick on Evidence,* § 340(b), p.798 (2d ed.1972))].

Manifest error exists only when review of the entire record shows that there is no reasonable factual basis for the factual finding at issue and that the fact finder is clearly wrong. *Stobart v. State*, *Dep't of Trans. & Dev.*, 617 So.2d 880 (La.1993). The supreme court explained the manifest error standard in *Rosell v. ESCO*, 549 So.2d 840, 844-45 (La.1989) (citations omitted):

> When findings are based on determinations regarding the credibility of witnesses, the manifest error—clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.

5

Accordingly, appellate courts must be cautious not to reweigh the evidence or to substitute their own factual findings just because they would have decided the case differently.

The primary factor in child custody determinations is the best interest of the child. La.Civ.Code art. 131. Louisiana Civil Code Article 134 enumerates twelve factors that a trial court should consider when making the best interest of the child determination. The trial court is not limited to considering these twelve factors, and it should consider the totality of the facts and circumstances in the particular situation. *Starks v. Starks*, 17-1139 (La.App. 3 Cir. 6/27/18), 250 So.3d 1025.

In her first two assignments of error, KF contends the trial court clearly erred as a matter of law and manifestly abused its discretion in granting JD sole custody of the children. She argues the trial court based its decision primarily on Article 134's tenth factor which addresses the facilitation of a relationship with the other parent and considered that factor "as trumping all other art. 134 factors under the particular circumstances of this case, where there was objectively substantial evidence that [JD] was abusing the children." She asserts that the trial court's "blind adherence" to the tenth factor put her in a "damned if I do, and damned if I don't" position with regard to protecting the children from sexual abuse. KF urges that while she did not prove JD sexually abused the children, substantial evidence supports her belief that the children were sexually abused; therefore, JD should not have sole custody. In furtherance of this argument, she asserts, without citing legal support, that when reviewing the trial court's judgment, this court should consider two 2018 revisions to Article 134 that provide:

6

(1) The potential for the child to be abused, as defined by Children's Code Article 603,[4] which shall be the primary consideration.

. . . .

(12) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party, except when objectively substantial evidence of specific abusive, reckless, or illegal conduct has caused one party to have reasonable concerns for the child's safety or well-being while in the care of the other party.

The parties presented their testimony; the testimony of a court-appointed child psychologist; an LPD police officer and DCFS employee involved in the investigation of the allegations at issue; DCFS employees who supervised KF's visitation with the children in the spring of 2017; a provisional licensed professional counselor who conducted therapy sessions with the children; the director of the children's school; an expert child-play therapist; KF's psychiatrist; a nursery supervisor at the church KF and the children attended who also served as a visitation supervisor for a period of time; two physicians who examined the children for sexual abuse; a board certified pediatrician who is also a certified child abuse pediatrician employed at the Audrey Hepburn Center (AHC), a child abuse center; and a social worker who is highly–educated and trained in the assessment

---

[4] Louisiana Children's Code Article 603 provides, in pertinent part:

(2) "Abuse" means any one of the following acts which seriously endanger the physical, mental, or emotional health and safety of the child:

. . . .

(c) The involvement of the child in any sexual act with a parent or any other person, or the aiding or toleration by the parent, caretaker, or any other person of the child's involvement in any of the following:

(i) Any sexual act with any other person.
(ii) Pornographic displays.
(iii) Any sexual activity constituting a crime under the laws of this state.

7

and evaluation of child sexual abuse. The parties also introduced records associated with these witnesses' testimony; additional medical records of the children; the records of Hearts of Hope (HOH), another child abuse center; pictures of the children; and videos of the children's therapy sessions, of them playing and interacting with others, and some interviews conducted during the investigations of KF's allegations.

The trial court made the following findings when issuing its ruling which show that the trial court considered the ten factors of Article 134 that are relevant herein:

(1) The love, affection, and other emotional ties between each party and the child:

> The parties are equal.

(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child:

> KF's taking the children to church and fostering religious instruction favors KF, as does her teaching the children sign language; however, her agreement to the November 6, 2014 consent judgment giving JD custody Monday through Friday when the children attended school negated a finding in her favor with regard to this factor.

(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs:

> KF always properly cared for the children (properly clothed, hair done and immaculate); nonetheless, this factor did not weigh equally between the parents and favored JD because he provided all financial support for the children, and it was not clear that KF could make ends meet with out assistance of others. This fact is a big part of finding that KF's visitation with the children would no longer be supervised.

(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment:

> The children's lives have been utter chaos due to various temporary and ex parte orders that are the result of KF's determination to prove JD sexually abused the children.

8

(5)  The permanence, as a family unit, of the existing or proposed custodial home or homes:

> JD favored due to KF's changes in jobs and reliance on others for financial support throughout the children's lives.

(6)  The moral fitness of each party, insofar as it affects the welfare of children;

> The trial court explained:

> The moral fitness of each party as it affects the welfare of the children . . . this cases [sic] hinges on factor number ten.  You can bleed it into moral fitness, I don't think it's a moral issue. I think it's more of a mental health issue coupled with an inability, a lack of capacity, a lack of ability and willingness to facilitate any relationship. A failure to encourage any close and continuing relationship between the child and the other party being dad. When you have these ongoing, reoccurring allegations that are wholly unfounded it's impossible, impossible for me to make a finding on the totality of the evidence here some of the joint custody is in the best interest of the children.

(7)  The mental and physical health issues of each party:

> Concerned as to whether something is going on with KF because she is convinced of abuse and is on an unending quest to prove it and believes her treating physician does not have "the complete picture" of her situation because she does not provide him accurate information about what is going on with her and her personal situation.

(8)  The home, school, and community history of the child:

> While in JD's custody, the children regularly attended school, got along well with classmates, and were well behaved with no indications of trouble at home or personally; the children did not attend school regularly when in KF's custody.

(10)  The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party:

> See factors (6) and (7) above.

(12)  The responsibility for the care and rearing of the trial previously exercised by each party:

> No evidence supports KF's claim of being primary caregiver because JD had custody of children Monday through Friday beginning November 6, 2014, until the summer of 2016, when KF's allegations of abuse escalated.

The trial court did use the phrase "this case hinges on factor 10" when ruling. However, it is abundantly clear from our review of the record that the trial court's in-depth assessment of these pertinent factors[5] and factual conclusions are reasonable and substantiated by the record. KF argues the trial court's finding that her continued allegations of sexual abuse are unfounded is contradicted by the medical evidence, urging that the physical findings of the physicians who examined the children in 2016 evidence a real concern that JD abused the children and should not have sole custody.

Dr. Carolyn Green works in the pediatric emergency room of a Lafayette hospital; she is board certified in pediatrics and neonatology. She saw the children on two occasions: July 24, 2014, and November 11, 2016. On the first visit, the children were not quite two years of age. KF reported that she suspected sexual abuse by JD after she observed J1's bottom and J1 answered "dada" to her question, "what happened." Dr. Green testified that she observed redness of J1's external genitalia, a contusion, anal scar, and mildly decreased rectal tone. As to whether the examination evidenced sexual abuse, Dr. Green related that other explanations existed for her findings, e.g., redness is quite common in toddlers of that age as diaper irritation can cause such redness and that contusions can be caused by a child's activities. As to the findings of the scar and lax rectal tone, she explained that the former could simply be the child's anatomy, while lax rectal tone could result from passing a hard stool. J2's examination at that visit revealed what appeared to be a slight bruise of her external genitalia which Dr. Green

---

[5] The two factors not considered, the preferences of the children and the distance between the parties' residences, have no bearing herein due to the children's ages and lack of evidence.

testified could have been caused by riding toys and possibly a fall. Dr. Green opined that her physical findings on that visit were suggestive of sexual abuse but not definitive.

On November 11, 2016, KF returned to the same emergency room with more allegations of sexual abuse. She reported that J2 told her JD touched her genitals. When Dr. Green asked J2 what happened, she talked about other things. Dr. Green testified that she could only confirm with J2 that JD touched her "privates" with his fingers. On examination, Dr. Green noted mild redness of external genitalia but no abrasions. Her differential diagnosis was alleged sexual abuse and contusions. KF reported that J1 told her JD touched her private area. Dr. Green noted that after a long time of questioning, J1 stated that JD put his finger and a stick in her "tee tee" and bottom. Dr. Green's examination revealed no significant external redness, but she noted what appeared to be a healed hymenal scar; no contusions or abrasions were noted. Dr. Green explained that the hymenal scar could be a variant of normal being and just formed that way. She acknowledged that she had not noted the scar two years earlier and explained it could have been present but not observed due to the nature of examining a two-year-old child. Dr. Green testified that her examinations raised concerns of sexual abuse, but did not confirm such abuse, and that her findings were consistent with what the children told her. She acknowledged that physicians who are board certified in child sexual abuse are in the best position to determine whether child sexual abuse occurred.

Dr. Lauren Fletcher Luke examined the children on November 14, 2016. She was recognized as an expert in family medicine with an emphasis on women. She treats children in her practice and has some formal training in pediatrics,

11

including child sexual abuse; she is not certified in either field. Dr. Green saw KF first, who reported suspecting sexual abuse by JD for a while. She examined J2 alone. Dr. Green testified that during her examination, she blew up a glove to entertain the child and testified that J2 pointed to and grabbed the pointer finger of the glove and stated "my daddy puts his pointer in my tee tee and his thumb in my bum," then "she started crying he did it two times, he did it three times I told him to stop and he wouldn't stop." Dr. Luke further testified that J2 was crying and "kept saying it hurt really bad and he would not stop" and reported that her "tee tee" hurt. According to Dr. Luke, J2 further stated that she wanted to be in a safe place and that she was safe with KF. Dr. Luke testified that the encounter and J2's revelations made her very concerned.

Dr. Luke next testified that as soon as she entered the examination room with J1 and asked her how she was feeling, J1 stated that "it burns down there," "mean" father touches her on the bottom, and she was scared; J1 then started shaking. J1 did not relate exactly what occurred, but Dr. Luke explained that she seemed to be reliving whatever she experienced. Like J2, J1 started saying that she wanted to be in a safe place. J1 asked Dr. Luke if she could protect her because she did not want to go back, and stated, it "hurted." She then began crying.

On examination, J1's genitalia had redness and inflammation and was tender to her touch. Dr. Luke noted her hymen was partially torn. She explained that sexual abuse, riding a bike, and gymnastics could cause such a tear. She diagnosed vaginitis with a yeast infection. J2's exam was similar with inflammation and hymenal tear. Dr. Luke also noted, however, laxity of her vaginal canal, which she testified was unusual for a child of J2's age and could be the result of sexual abuse.

12

Dr. Luke reported suspected sexual abuse to DCFS. She also acknowledged that AHC experts were more qualified to make determinations of sexual abuse.

Standing alone, Dr. Green and Dr. Luke's findings seem to support KF's position. That changes, however, when their findings are considered in the context of when they occurred, other evidence produced at trial, and a child abuse expert's testimony. Beginning in July 2016, KF had temporary sole custody of the children, and JD had no visitation with them until November 6, 2016. On that date, he began having supervised visitation on Sundays and Wednesdays. Accordingly, he only had *supervised* visitation with the children on November 6 and 9 before Dr. Green saw them on November 11 and 13, and Dr. Luke saw them on November 14. On November 14, 2016, in a petition to terminate supervised visitation and for sole custody and a temporary restraining order, KF alleged that JD was left unsupervised with the children during his visitations on November 6 and 9, which she testified was based on reports by the children to her.

Dr. Green's findings as to hymenal scarring and Dr. Luke's findings as to a partially torn hymen and vaginal laxity were controverted by Dr. Ellie Wetsman, a board certified general pediatrician and child abuse pediatrician, who works at AHC. Dr. Wetsman reviewed the medical evidence of the children's prior physical examinations in light of the two examinations performed at AHC in March and December 2016, as well as the forensic interviews of the children conducted by others at AHC, and concluded that the evidence did not substantiate that the children had been sexually abused. She personally examined the children in December 2016 and was questioned in detail with regard to her findings and the findings made by Drs. Green and Luke in November. Dr. Wetsman disagreed with specific findings made by each physician and explained that as to the finding of a

13

hymenal tear: if a hymenal tear existed at the time of the November exams, it would have remained visible at the time she examined the children in December, and she did not observe such a tear. She further explained that she had no knowledge of the term "vaginal laxity" with regard to children.

Psychiatrist Edgardo Concepcion is KF's treating physician. He was qualified as an expert in child, adolescent, adult, and geriatric psychiatry. Dr. Concepcion testified that KF has been diagnosed with ADHD, depression, anxiety, and bipolar disorder and explained that different stressors can cause such a patient's coping skills to diminish, such that they can no longer handle certain situations. Dr. Concepcion believed that KF was very truthful with him as to what was going on in her life. However, KF never told him that she had been arrested twice for domestic violence, and a comparison revealed discrepancies between her reports to him with regard to JD and the children and what was actually going on in her life. For example, she told him she was going to be the domiciliary parent when she had agreed for JD to have physical custody of the children more often than her. At her October 26, 2016 appointment, KF reported that she was very anxious about the children being removed from her custody and that it was very hard for her to do anything else. Just over two weeks later, she brought the children to Drs. Green and Luke, alleging abuse after they had supervised visitation with JD.

With regard to the children's reports of abuse to Drs. Green and Luke, investigators documented that the children stated to the effect that "mommy says daddy touches my privates," but he does not. Additionally, visitation supervisors for KF's visits with the children during the spring of 2017 documented that KF frequently tried to whisper to the children and also exhibited aberrant behavior in

14

public and toward the supervisors that led DCFS personnel and Dr. Cavanaugh to conclude that KF was coaching the children to report sexual abuse. The trial court rejected this finding. Nonetheless, based on the trial court's observations as to KF's mental health and its affect on her behavior, it is reasonable to discount the children's reports to Drs. Luke and Green, finding that KF influenced their reports to the physicians.

An important component of investigating sexual abuse in children involves behavioral indicators of such abuse, which include: fear, shame, guilt, anger, or physical aggression, as well as precocious sexual knowledge, sexual acting out, sexual behaviors that are out of balance with other aspects of the child's life, and sexual behaviors that continue even after the child has been told to stop. No persons involved in the investigation of the alleged abuse documented such behavior, and none was observed in videos of the children. Two witnesses addressed the children's behavior. Susan Arceneaux, the director of the school they attended from 2014 through 2017, testified that she never personally witnessed any signs of abuse, and no employees who worked in the children's classes reported such abuse. She explained that the children never appeared distressed or withdrawn and that she never observed them discussing their private areas, intruding in other students' personal boundaries, showing regression, or engaging in aggressive behavior. In her view, the girls' demeanor was typical of children going through some changes, but nothing out of the ordinary. She also observed that when the children returned to school after the long absence in 2016, they got back in the routine within the first day. In her opinion, they were "right on par" for their age, had no social issues, were very verbal, and could ask for what they needed.

Sally Creed, PhD, a licensed professional counselor who deals with children and was recognized as an expert in play therapy with children, testified that she was hired by DCFS as part of its investigation of KF's sexual abuse allegations. She testified that her role is to observe children as they play, what they play with, and how they interact with each other. J1 and J2 attended ten sessions with her. During one session in May 2017, J2 told her that KF wanted her to say dad touched my "pirates." At that point, the two children laughed together, then J2 corrected herself and said "privates." Later, J1 told Dr. Creed she had a bad secret. When asked what, J1 told Dr. Creed that she did not know how to tell KF that JD does not touch her privates. Dr. Creed opined that J1 was upset about being told to say this about JD when it was not true. She testified that during the ten sessions she had with the girls, she did not observe anything that concerned her. She described their play as interactive, creative, completely benign, showing no stress at all in terms of their life with JD and stated that the children rarely talked about KF. She also testified that the children were very close to JD, jumped on him, and were very connected with him.

KF relies on the testimony of her expert witness Dr. Viola Vaughn-Eden to support her arguments. Dr. Vaughn-Eden is a highly educated, experienced, and accomplished social worker in the fields of child sexual abuse and allegations of such abuse. She testified that she has evaluated more than 1,000 children for sexual abuse, primarily at a child advocacy center but also in her private practice. The trial court recognized Dr. Vaughn-Eden as an expert in (1) the assessment, evaluation, and investigation of cases involving child sexual abuse; (2) the assessment, evaluation, and treatment of sexually-abused children when the mother

is the non-offending parent; (3) interviewing of sexually-abused children; and (4) the dynamics of child sexual abuse.

Dr. Vaughn-Eden testified that she examined the same records Drs. Cavanaugh and Wetsman reviewed. She had personal contact only with KF in a telephone conversation; she did not conduct an evaluation of the children. She disagreed with Drs. Cavanaugh's and Wetsman's conclusions that the evidence did not support the conclusion that the children had been sexually abuse and explained in detail what led her to conclude otherwise. In connection with her opinion that the children were abused, Dr. Vaughn-Eden noted that one physician's records and the records of HOH were powerful because the children described all of the sensory pieces in their disclosure of sexual abuse, e.g., the emotions of being sad and fearful. She also opined that in all the videos she reviewed, the children's disclosures were consistent and supported the fact that they were abused. Dr. Vaughn-Eden testified that she would have liked to have information regarding the children's social behavior and whether any changes occurred but was not provided such evidence.

The trial court considered extensive evidence on the issue of what custody arrangement would be in the best interest of the children and concluded JD having sole custody was best. Our review of all the evidence reveals no manifest error with the trial court's factual findings and judgment. Applying La.Civ.Code art. 134's 2018 amendments would not result in a different conclusion because our review does not reveal any "objectively substantial evidence of specific abusive" conduct by JD that establishes "the potential" of the children being abused by him.

17

*Court Costs*

In her last assignment, KF argues the trial court erred in assessing one-half of Dr. Cavanaugh's charges and all court costs to her. The trial court also assessed JD with one-half of Dr. Cavanaugh's fees.

The trial court has the authority to assess costs as it deems equitable. La.Code Civ.P. art. 1920. Having found no error with the trial court's awards of custody and visitation, we find no error with its assessment of only one-half of Dr. Cavanaugh's fees and all court costs to KF.

## DISPOSITION

The trial court's judgment awarding JD sole custody of the children and KF visitation with the children is affirmed. All court costs are assessed to KF.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2–16.3.

18